THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DOMINICK DERCOLE, WILLIAM LUNGARELLI and JULIUS CIANCIOLA, Appellants.

Second Department, February 4, 1980

## APPEARANCES OF COUNSEL

*Weinberger, Weinberg, Kert & Weinberger (Gary Schoer* of counsel), for appellants.

*Roderick C. Lankler, Deputy Attorney-General (Vincent J. Torna* and *Mark M. Baker* of counsel), for respondent.

## OPINION OF THE COURT

LAZER, J.

■ These appeals are from judgments which, after a non-jury trial, convicted the defendants of the crime of criminal contempt in the first degree (Penal Law, § 215.51) and sentenced each of them to five years probation. The defendants contend that (1) the trial court erred in refusing to dismiss the indictments as a matter of law when it determined defendants were denied effective assistance of counsel; (2) the defendants' guilt was not proven beyond a reasonable doubt; (3) the verdicts were repugnant; (4) the trial court erroneously shifted the burden of proof to the defendants; and (5) the failure to dismiss the second count of each indictment was error because that count was based upon an improper and illegal interrogatory. We conclude that the verdicts rendered were repugnant and that reversal of the convicting judgments and dismissal of the indictments is mandated.

On December 18, 1974 the defendants first appeared before an Extraordinary and Special Grand Jury, Queens County, impaneled to investigate illegal gambling activities and bribery of officials of the New York City Police Department. After

being given full immunity, the defendants were sworn as witnesses but refused to answer any questions until they could consult with counsel. They were granted an adjournment to do so.

On January 8, 1975, January 15, 1975 and January 22, 1975, the defendants again appeared before the Grand Jury and each time were granted full immunity, given a detailed explanation of the meaning of such a grant, and advised that in light of the grant of full immunity, refusals to answer any questions posed by the prosecutor could lead to a criminal contempt indictment. On each occasion, the defendants invoked their Fifth Amendment rights and refused to answer each and every one of the numerous questions put.

In October, 1975 indictments were filed by the office of the Special State Prosecutor charging Dercole and Cianciola with eight and Lungarelli with nine counts of criminal contempt in the first degree. The gravamen of the indictments is that after having been sworn as witnesses the defendants contumaciously and unlawfully refused to answer proper and legal questions put to them. The first count of each indictment charges that the defendant charged refused to answer concerning his knowledge of pending bribery indictments, while the second count alleges that the accused refused to answer questions concerning his acquaintance with individuals against whom bribery indictments were pending.

As to the remaining counts of the indictment against the defendant Dominick Dercole, the third and fifth relate to his refusal to answer questions concerning attempts to influence or fix pending criminal cases; the fourth relates to his refusal to answer questions concerning loansharking activities; the sixth relates to his refusal to answer a question concerning illegal activities of members of the judiciary; and counts seven and eight relate to his refusal to answer questions concerning payments made to police officers.

In the indictment against the defendant William Lungarelli, the third and fourth counts relate to his refusal to answer questions concerning the payment of bribes to police officers, District Attorneys or members of the judiciary; the sixth relates to his refusal to answer a question concerning loansharking activities; the fifth, eighth and ninth relate to his refusal to answer questions pertaining to attempts to fix pending criminal cases; and count seven relates to his refusal

to answer a question concerning the involvement of members of the judiciary in criminal activities.

The third count of the indictment against defendant Julius Cianciola relates to his refusal to answer questions concerning bribes paid to police officers; the fourth, seventh and eighth relate to his refusal to answer questions concerning payments made to lawyers and Judges for the purpose of influencing pending criminal cases; and counts five and six relate to his refusal to answer questions concerning loansharking activities.

In October of 1976, Cianciola pleaded guilty to the fourth count of his indictment.

### THE MOTION FOR DISMISSAL

On November 22, 1976, Dercole and Lungarelli moved to dismiss the indictments against them on the ground that the attorney they retained to represent them before the Grand Jury and who advised them to invoke their Fifth Amendment privilege was himself a target of the Grand Jury investigation. They contended that they had been denied effective assistance of counsel and were misled and tricked into invoking their Fifth Amendment rights. Because the issues raised on the motion affected Cianciola's constitutional rights, he was invited to participate in the dismissal hearing without prejudice to his rights to withdraw his plea, if any. He accepted the offer and joined in the motion to dismiss.

At the hearing on the motion, the defendants called as a witness Martin Stewart, the attorney who they claimed had given them the advice concerning their Grand Jury appearances. According to Stewart's testimony, he knew Cianciola through two long-time friends, Frank Altimari and Nick Bonina, two of the indicted individuals about whom the defendants were questioned before the Grand Jury, but he never told the defendants of his relationship with Altimari and Bonina. In August of 1974 he was contacted by two agents from the Federal Bureau of Investigation who showed him a group of 10 to 12 photographs which included pictures of Altimari, Bonina, Cianciola, Dercole and Lungarelli and who asked if he knew any of the persons in the pictures. One of the agents also suggested that Stewart himself was involved in the "shylocking" business. Stewart denied any such involvement to the F.B.I. agents, but at no time prior to or during his

representation of defendants did he advise them of the visit from the agents.

According to Stewart, upon his arrival at the Grand Jury in January, 1975 he had a conversation with Carl Soller, the Special Prosecutor in charge of the investigation. Soller informed him that the Grand Jury was investigating corruption, gambling and shylocking; that there were lawyers involved; and that Altimari, Bonina and a lawyer were targets of the investigation. Stewart stated to the court that he informed the defendants that the thrust of the investigation was corruption of public officials, gambling and shylocking but he did not recall discussing anything about the involvement of lawyers in these activities.

Stewart also said that he advised the defendants that they should invoke their Fifth Amendment privilege rather than testify before the Grand Jury even though they might possibly be subjecting themselves to contempt charges by their refusal to answer questions. He gave this advice because he believed that although the defendants had been granted immunity they might still be subject to Federal prosecution and, therefore, they would have a defense to any contempt charges brought against them. Stewart then testified that at the time of his representation of the defendants he felt that it was in their interests to invoke their privilege against self incrimination, but since then he had time to reflect on the situation and came to a realization that his advice to the defendants was motivated by a subconscious feeling that he was a target of the Grand Jury. While he indicated that some indecision existed in his own mind as to whether he was, in fact, a target, he concluded that under the circumstances it was in his own best interest to have the defendants refuse to testify and that he believed a conflict of interest existed subconsciously. Finally, Stewart revealed that in February, 1975 Cianciola had been called before a special Federal Grand Jury and that he represented him there. At that time, Cianciola was granted immunity, but refused to testify. It is unclear from the record whether the refusal was based on Stewart's advice.

After considering the evidence presented at the hearing, the trial court denied the motion to dismiss the indictments. While finding that the defendants were denied effective legal representation, the court held that under the circumstances the denial of such representation was not so severely prejudi-

cial as to warrant dismissal of the indictments. The court also found that there was no showing in the record that the defendants had relied on advice of counsel.

## THE TRIAL

· The trial of the indictments against Dercole and Lungarelli subsequently commenced with the introduction of their Grand Jury testimony and a number of stipulations between the People and counsel for the defendants. Under these stipulations, it was agreed, *inter alia,* that the transcripts of the defendants' Grand Jury testimony were properly prepared and accurately reflected what was said in the Grand Jury by the defendants, that the Grand Jury was conducting an investigation to determine whether officials of the New York City Police Department were repeatedly bribed by the defendants and others involved in organized crime activities for the purpose of obstructing pending investigations; that on December 18, 1974, January 8, 1975, January 15, 1975 and January 22, 1975, respectively, the defendants, Lungarelli and Dercole, appeared before the Grand Jury as witnesses, were granted immunity, and were questioned concerning the matter under investigation; and that the questions which were the predicates of these indictments were lawful and proper interrogatories, subject however, to the defendants' motions to strike certain of them.

After Dercole and Lungarelli introduced the hearing testimony of Carl Soller, Martin Stewart and Special Agent Allen Sadowski, and the transcript of a taped conversation between Stewart and Frank Altimari and the report of an F.B.I. agent concerning a conference with Martin Stewart, the defendants rested and moved to dismiss the indictments.

## THE VERDICTS

In an oral decision jointly disposing of defendants' motions and rendering verdicts, the trial court dismissed as duplicitous the seventh, eighth and ninth counts of the Lungarelli indictment and the eighth count of the Dercole indictment. After dismissing the first count of both the Lungarelli and Dercole indictments on the ground that the Grand Jury question upon which the indictment was based was not a proper and legal interrogatory within the meaning of section 215.51 of the Penal Law, the court found Lungarelli and Dercole guilty as

to the second count of both indictments and not guilty as to all the remaining counts.

Cianciola then moved to withdraw his guilty plea, to join the stipulations entered into by the other defendants, and to adopt the evidence offered by them. After these motions were granted, Cianciola was found guilty of the second count of his indictment, the first and eighth counts were dismissed, and he was found not guilty on the third, fourth, fifth, sixth and seventh counts.

Each count of each indictment alleged a violation of section 215.51 of the Penal Law (criminal contempt in the first degree) for "contumaciously and unlawfully" refusing to answer a particular question. The questions which underlie the second count upon which each defendant was found guilty, and the balance of the counts upon which each was found not guilty, follow:

Dercole:

Second: Are you acquainted with any of the people whose names I've mentioned?

Third: Are you familiar with any situations in which Frank Altimari or Nicholas Bonina have attempted to fix criminal cases?

Fourth: Are you familiar with any attorneys who were involved in loan sharking with any of those people that I have mentioned?

Fifth: Are you familiar yourself Mr. Dercole with police officers whom you have paid off regarding any criminal cases that you have had?

Sixth: Are you familiar with any Judges in the County of Queens who have been or are involved in illegal activities?

Seventh: Do you know of the police officers to whom money was given by any of the individuals whose names I have previously mentioned?

Lungarelli:

Second: Mr. Lungarelli, the individuals that I mentioned, are you acquainted with them?

Third: Mr. Lungarelli, were you present during the time that any of these [certain named] individuals paid police officers in connection with their illegal activities and paid the money as bribes?

Fourth: Are you familiar with any bribe situations involving the individuals that I have mentioned which occurred between those individuals and Judges, District Attorneys or police officers?

Fifth: Are you familiar with any attorneys who have ever attempted or did fix cases which were pending in the criminal courts against any of the individuals whom I have mentioned?

Sixth: Mr. Lungarelli, are you familiar with any attorneys, district attorneys or police officers who are involved in loan sharking either as the loaner of money or the victim of a loan shark?

Cianciola:

Second: Mr. Cianciola, are you familiar, and do you know any of the individuals whose names I've previously mentioned?

Third: Mr. Cianciola, have you been present or were you present in any situations when money was paid by the individuals whose names I have mentioned to police officers in connection with their gambling operations?

Fourth: Are you familiar with any lawyers or judges with whom the individuals I have mentioned have dealt with in order to fix any criminal cases they might have pending against them?

Fifth: Are you familiar with any attorneys who are involved in loan sharking Mr. Cianciola either as victims or lenders?

Sixth: Are you familiar with any attorneys who are being extorted as a result of owing money to loan sharks?

Seventh: Mr. Cianciola, are you aware of any situations in which an Assistant District Attorney accepted money in order to give favorable treatment to any of the defendants whom I have previously mentioned in a case pending against any of those defendants?

In the course of its decision, the trial court posed five questions: (1) whether Stewart's "dual role" deprived the defendants of their right to counsel; (2) if so, whether the deprival nullified the Grand Jury proceedings and, therefore, the indictments; (3) if the indictments, nevertheless, did survive as valid, was intent "spelled out beyond a reasonable doubt"; (4) did the Special Prosecutor's failure to advise the defendants concerning immunity to Federal prosecution justify their refusal to testify; and (5) were the interrogatories legal and proper.

After finding the interrogatories proper and expressing sharp concern over the quality and sincerity of defendants' representation by Stewart as well as the conduct of the Special Prosecutor, the trial court concluded that "there was * * * no justification in refusing to testify." The not guilty findings were explained as follows: "on the question of willfulness in refusing to answer, the court in most instances is uncertain, is unable to make up its mind as to the effect the poisoned, shall we say, legal advice that these men received. That uncertainty in the court's mind, translates to—into a question of whether or not it can be said as a matter of fact, or of law, that the willfulness required in the statute was clearly spelled out beyond a reasonable doubt."

As to the second count of each indictment, the finding of guilty was explained in these words: "It just seems to me * * * I at this moment am not convinced that the poisoned advice could have had any effect, one way or the other, on the witness' willfulness in refusing to answer that question".

The defendants contend that the guilty verdicts on the second count of each indictment are wholly repugnant to the not quilty verdicts on other counts and that reversal of the

convictions is mandated. Although we agree, we believe that the profusion of holdings in the area of verdict inconsistency requires examination of the theoretical foundation of inconsistency jurisprudence and some conclusion as to the present posture of the law in this State.

### THE ORIGIN OF INCONSISTENCY RULES

Verdicts which encompass findings of both guilt and nonguilt on an indictment containing two or more counts against a single defendant raise a question as to whether the factual and legal conclusions implicit in the guilt finding or findings are rationally compatible with those implicit in the finding or findings of nonguilt as to other counts. A lack of rational compatibility between such verdicts is usually referred to as an "inconsistency" (see Inconsistency of Criminal Verdict as Between Different Counts of Indictment or Information, Ann. 18 ALR3d 259). Although the distinction between "inconsistency" and "repugnancy" has been characterized as one which confuses substance with semantics (see *De Sacia v State*, 469 P2d 369, 378 [Alaska]), "repugnant" remains the term most frequently applied to verdicts whose inconsistency is of such dimension as to warrant reversal.

The concept of fatal repugnancy in verdicts is of venerable derivation. Although its most famous exposition is to be found in Justice BUTLER's dissent in *Dunn v United States* (284 US 390, 394), the rule requiring rationally inconsistent verdicts to be overturned "probably * * * was the common law, though it is hard to find a case squarely so holding" *(Steckler v United States*, 7 F2d 59, 60). As early as 1819, Chitty wrote: "where the decision is repugnant, as if [the jury] find one guilty alone of conspiracy, and acquit the other, they will, on explanation that they cannot find that one person alone was guilty of a conspiracy, withdraw, and may, on reconsideration, find both the defendants guilty. But it is considered as bearing too hard on the prisoner, and has been seldom done in modern times, when the decision is in his favour." (1 Chitty, A Practical Treatise on the Criminal Law, at pp 528-529 [Riley ed, 1819].)

Early cases dealing with inconsistent verdicts both in this country and in England reviewed situations in which the jury returned guilty verdicts on separate counts in a single indictment charging the defendant in the alternative with having stolen certain goods and having received the goods knowing they were stolen. The legal uncertainty and inconsistency

inherent in such a verdict was held to mandate reversal and a new trial to determine the precise charge upon which the jury found guilty (see *Regina v Evans,* 7 Cox Cr Ca 151 [QB]; *Tobin v People,* 104 Ill 565; *Commonwealth v Haskins,* 128 Mass 60; cf. *State v Speight,* 69 NC 72). In other cases verdicts which found only one of two defendants guilty of conspiracy (see *United States v Hamilton,* 26 Fed Cas 90; *Feder v United States,* 257 F 694; *Queen v Manning,* 12 QBD 241; see, also, *People v Munroe,* 190 NY 435) or which found fewer than the minimum three guilty of riot *(Rex v Heaps,* 2 Salk 593; *King v Sudbury,* 12 Mod 262) were annulled.

The prohibition era gave rise to a flourish of cases in which verdicts were challenged as repugnant, but until *Dunn v United States (supra)* the discordant results yielded no precise guidelines for determination of the issue. Almost invariably, the indictments in the prohibition cases charged the defendants with nuisance in maintaining an establishment where intoxicating beverages were kept or sold, coupled with counts of possession or sale of intoxicating beverages (see, e.g., *Murphy v United States,* 18 F2d 509; *Gozner v United States,* 9 F2d 603; *Steckler v United States,* 7 F2d 59, *supra; Marshallo v United States,* 298 F 74; *Hohenadel Brewing Co. v United States,* 295 F 489; *Carrignan v United States,* 290 F 189; cf. *Boyle v United States,* 22 F2d 547). In *Hohenadel,* the defendant was found not guilty on six counts charging unlawful manufacture or sale of intoxicating beverages, but guilty on the seventh count charging nuisance. The Circuit Court of Appeals reversed, concluding that there was an insufficiency of evidence to sustain the nuisance charge since the jury's findings of not guilty on the other counts rendered the facts alleged in them to be nonexistent. But, in *Carrignan* and *Marshallo,* the convictions on the nuisance counts of the respective indictments were sustained, notwithstanding the jury's failure to convict on the possession or sales counts.

In *Steckler v United States (supra),* Judge LEARNED HAND perceived an inconsistency in verdicts that found the defendant guilty of unlawful possession of intoxicating liquor but not guilty on a count charging nuisance by maintenance of an establishment where liquor was kept for sale and two counts of unlawful sale. Nevertheless, in affirming the convictions, he posited (p 60): "The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not

show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."

## DUNN V UNITED STATES AND ITS FEDERAL PROGENY

When the inconsistency issue finally reached the Supreme Court in *Dunn v United States* (284 US 390, *supra),* in 1932, the majority concluded that consistency in verdicts is not necessary. The rule enunciated in *Dunn* remains in effect in the Federal courts and in most States (Wax, Inconsistent and Repugnant Verdicts in Criminal Trials, 24 NYL School L Rev 713; Inconsistency of Criminal Verdict as Between Different Counts of Indictment or Information, Ann. 18 ALR3d 259, although Justice BUTLER's dissent still survives as the jurisprudential predicate for holdings to the contrary.

Dunn was indicted on three counts for maintenance of a nuisance in keeping liquor for sale at a specified place, unlawful possession of liquor, and unlawful sale of liquor. Although the evidence adduced was the same for each count, the jury acquitted on the sale and possession counts while convicting on the nuisance count. Speaking for the majority, Justice HOLMES rejected the argument that the verdicts were fatally inconsistent, declaring (pp 393-394):

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment * * * If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as *res judicata* of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold. * * *

"That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters".

Disagreeing, Justice BUTLER reasoned that the facts alleged under the possession count of the indictment were negatived by the jury's not guilty verdict, thus rendering paradoxical the conviction on the nuisance count, an essential element of which was the defendant's possession of intoxicating liquor.

Justice BUTLER concluded that the contradictory finding on an essential fact rose beyond the level of "mere inconsistency" to the level of "repugnancy" in the verdict requiring reversal and a new trial. His rationale, cogently stated (pp 406-407) is that: "[W]hen different crimes are charged in separate counts and the jury acquits as to one and convicts on the other, the conviction will be sustained unless, excluding the facts which the jury in reaching its verdict of acquittal necessarily found not proved, it must be held as a matter of law that there is not sufficient evidence to warrant the verdict of guilty; and, where the evidence outside the facts so conclusively negatived by the acquittal on one count is not sufficient to sustain guilt on the other count, defendant is entitled to a new trial." According to Justice BUTLER, conflict between the findings of a jury was not a subject for explanation. "The inference that the jury, seeking rightly to discharge its duty, made a mistake, is to be preferred over the suggestion that it found for defendant upon an assumption of power it might not lawfully exert" (284 US, at p 407).

In the years that followed *Dunn,* the Federal courts have continued their adherence to it in literally hundreds of cases (see, e.g., *Hamling v United States,* 418 US 87, reh den 419 US 885; *United States v McCall,* 592 F2d 1066, cert den 441 US 936; *United States v Martorano,* 557 F2d 1, reh den 561 F2d 406; *United States v Heavlow,* 468 F2d 842, cert den 410 US 933; *United States v Carbone,* 378 F2d 420) with extremely limited exceptions (see *Sealfon v United States,* 332 US 575; *United States v Hannah,* 584 F2d 27).

The current Federal posture was recently described as follows: "The settled rule in the federal system is that it is the prerogative of the jury *simultaneously* to return inconsistent verdicts. We have been cited to no case which recognizes the exception appellant urges us to adopt, and any such exception, in our view, would be both unwise and arguably inimical to the interests of criminal defendants generally. The present rule permits the jury to enter into compromises and to act out of leniency; if it were to be changed, the jury would have to be instructed that any inconsistencies in their verdicts would vitiate any guilty verdicts they might return, and the net result might be that fewer defendants would be acquitted on individual counts. And such an exception would be unwise. The jury's deliberations have always been regarded as sacrosanct, and the adoption of appellant's proposed exception

would undermine the strong policy against probing into the jury's logic or reasoning and would open the door to interminable speculation." *(United States v Martorano,* 557 F2d 1, 9, *supra;* emphasis in original.)

Defending the *Dunn* rule in 1950, Professor Bickel warned that: "Should *Dunn* be overruled, jurors who in the typical inconsistent verdicts case presumably believe that, in the sense of having done the act charged, the defendant is guilty, would be strongarmed into rendering an all-or-nothing verdict: innocent on all counts, or guilty on all. This would be accomplished through instructions more peremptory than can be obtained now; or through forced reconsideration; or through new trials until a jury is found which obeys instructions. Such a state of affairs would prevail until the next logical step was taken and the jury's power to acquit curtailed also. At present *Dunn* permits a sensible compromise between the necessity of convicting some likable people, or defendants who have committed a momentarily popular crime, and the tendency of juries to be reluctant to do so." (Bickel, Judge and Jury-Inconsistent Verdicts in the Federal Courts, 63 Harv L Rev 649, 652.)

### DUNN IN NEW YORK

Whatever the wisdom of the HOLMES opinion in *Dunn,* well over three decades elapsed before New York was to accept repugnancy as a basis for the overturn of inconsistent verdicts. The change in position was not modest because the repugnancy concept had been rejected in the State long before *Dunn.* As remotely as 1876, in *Harris v People* (64 NY 148), the court turned away a repugnancy challenge to a perjury conviction by speculating that the jury might have decided that the perjury count upon which they acquitted was unproven on the evidence adduced, although the proof referred to in the opinion seems quite adequate. Consistent with *Harris,* the pre-*Dunn* years in New York were singularly free of reversals on repugnancy grounds. Apart from a few cases involving the simultaneous conviction of one person and acquittal of another on the same charges and evidence (see *People v Munroe,* 190 NY 435, *supra; People v Safe-Way Coal Co.,* 242 App Div 659; *People v Massett,* 55 Hun 606, opn in 7 NYS 839), only in the reversal of a conviction in *People v Haupt* (221 App Div 485) was there discerned a repugnancy in verdicts relating to a single defendant. Nevertheless in an affirmance based on the

Third Department's determination of the facts in *Haupt*, the Court of Appeals quickly expressed its disagreement with the lower court's view of inconsistency, declaring that "[i]llogical as it may seem under the proof" the jury had the right to regard one count as unproven (see *People v Haupt*, 247 NY 369, 371).

*Dunn* thus accorded with established New York precedents, and until *People v Bullis* (30 AD2d 470) in 1968, it achieved a virtual consensus in the State. *People v Sciascia* (268 App Div 14, affd without opn 294 NY 927) approved the rule tersely and adherence to it continued uninterruptedly (see *People v Torres*, 2 AD2d 134, affd 5 NY2d 804; *People v Steffens*, 12 AD2d 962; *People ex rel. Troiani v Fay*, 13 AD2d 999, mot for lv to app den 10 NY2d 707, cert den 368 US 1003; *People v Hovnanian*, 16 AD2d 818). Remarkably, sporadic support for *Dunn* still surfaces despite the State's clear turn from it (see *People v O'Bryan*, 36 AD2d 548; see, also, *People v Williams*, 47 AD2d 262 [dictum]; *People v Blandford*, 37 AD2d 1003 [dictum]).

In *Bullis* (30 AD2d 470, *supra*), a conviction for sexual misconduct and a simultaneous acquittal on charges of sodomy in the first degree were reversed as repugnant. Writing for the Fourth Department, Justice GOLDMAN declared (p 472) that: "When the indictment charges two crimes, each of which has identical elements, a finding of guilty on one but not on the other is truly repugnant, as opposed to being merely inconsistent."

*Bullis* was followed by *People v Pugh* (36 AD2d 845, affd 29 NY2d 909, cert den 406 US 921), which affirmed the conviction while paying obeisance both to *Dunn* and the repugnancy concept announced in *Bullis. Dunn's* real demise was quietly signaled by the Court of Appeals in a brief memorandum in *People v McEaddy* (30 NY2d 519) which reversed a sexual misconduct conviction which had been accompanied by a rape acquittal. A year later, in *People v Kass* (32 NY2d 856, affg 74 Misc 2d 682, 683, on opn at App Term), the Court of Appeals adopted the Appellate Term's definition of a "repugnant verdict" as one where "there has been a finding of guilt on one but not on the other of two crimes charged in an indictment, each of which has identical elements". *Kass,* which marked the first characterization of irreconcilable verdicts as "repugnant" by the Court of Appeals, adopted the "identical elements" principle enunciated in *People v Bullis (supra).* The

principle has since been applied in numerous cases (see, e.g., *People v Legrand,* 50 AD2d 936; *People v Speach,* 49 AD2d 210; *People v Wells,* 48 AD2d 934; *People v Tucker,* 47 AD2d 583; see, also, *People v Mandel,* 61 AD2d 563, 580, revd on other grounds 48 NY2d 952).

In *People v Carbonell* (40 NY2d 948), the Court of Appeals broadened its view of the repugnancy rule to encompass guilty verdicts which negatived an "essential element" of a count upon which there had been conviction. In *Carbonell,* the court reversed as "internally self-contradictory" a guilty verdict on robbery in the third degree where the jury had acquitted the defendant of larceny and petit larceny. *Carbonell* had been presaged by Appellate Division determinations in *People v Pierce* (40 AD2d 581) and *People v Belvin* (47 AD2d 929). In *Pierce,* despite the absence of a complete identity of elements in the two crimes, a conviction on a count charging sale of a dangerous drug was overturned as repugnant to an acquittal on a count charging possession with intent to sell. *Belvin* involved a defendant who had been indicted for robbery in the first and second degrees. Although the trial court submitted to the jury a count of robbery in the third degree as a lesser offense, it failed to charge that if the jury found the defendant guilty of the greater counts, it was to disregard the lesser one. When the jury returned guilty verdicts as to robbery in the first and second degrees, but not guilty as to robbery in the third degree, this court reversed the conviction and dismissed the counts declaring that while the verdicts were "understandable" in light of the erroneous charge, they were "inconsistent and repugnant". Negatived essential elements considerations thus have become another basis for reversal of verdicts on repugnancy grounds (see, e.g., *People v Mitchell,* 64 AD2d 119; *People v Edwards,* 61 AD2d 1016; *People v Robert YY,* 58 AD2d 920; *People v Kirkland,* 50 AD2d 574).

Although repugnancy jurisprudence in the State recognizes the *Dunn* dissent as seminal (see *People v Bullis, supra),* Justice BUTLER's caveat against reliance upon speculation to accommodate apparently inconsistent verdicts has not been the subject of faithful observance. Reviewing courts search for a "rational theory" (see *Poeple v Gross,* 51 AD2d 191, 198; see, also, *People v Dilan,* 58 AD2d 655; *People v Pugh, supra; People v Tucker, supra; People v Pierce, supra)* exclusive of jury mistake, compromise or lenity in order to explain and save convicting verdicts. In the cited cases, distinctions be-

tween the elements of the crimes in the proof or in the jury's potential evaluation of the proof were relied upon to support affirmances. In *People v Haymes* (34 NY2d 639, cert den 419 US 1003), however, the Court of Appeals seems to have gone even further in accepting an "understandable" jury mistake as to the theory upon which affirmance could be supported.

The *Haymes* indictment charged the defendant with murder and possession of a weapon with intent to use it unlawfully against the decedent. The jury acquitted on the latter count but convicted the defendant of manslaughter under the murder count. Despite instructions by the trial court to reconsider its verdict of manslaughter, the jury adhered to its original guilty finding. In affirming, the Court of Appeals rejected the contention that the weapons acquittal negatived the intent element necessary for the manslaughter conviction, noting that there was a strong showing on the record that the jury had misunderstood the "continuing nature" of the possession element of the weapons charge. Consequently, concluded the court, it could find the verdicts "reversibly inconsistent, or 'repugnant', only in a logical vacuum," because the weapons acquittal clearly was not meant to resolve the intent issue as to manslaughter in defendant's favor. *Haymes* skirts perilously close to the type of speculation against which Justice BUTLER warned, and it seems to violate the basic principle of the *Dunn* dissent that jury error may not be excused in order to save a verdict. Whether *Haymes* signifies an unheralded partial return to *Dunn* concepts (see, also, *People v Rivera,* 59 AD2d 675) is uncertain, but it does establish the importance of the search for a reasonable explanation as an ingredient of inconsistency analysis.

In sum, then, absent a rational theory for their existence, apparently inconsistent verdicts will be held repugnant when the crimes upon which the verdicts are returned are either identical as to each of their elements or so related that an acquittal on one negatives an essential element of the crimes upon which there was conviction.

### THE CURRENT REPUGNANCY

We turn, then, to the instant indictments, each count of which alleges a violation of section 215.51 of the Penal Law, which states: "A person is guilty of criminal contempt in the first degree when he contumaciously and unlawfully refuses to be sworn as a witness, before a grand jury, or, when after

having been sworn as a witness, before a grand jury, he refuses to answer any legal and proper interrogatory."

■ Convictions for the crime of criminal contempt require a showing that the witness was advised that full statutory immunity had actually been conferred upon him *(People v Mulligan,* 29 NY2d 20; see, also, *Matter of Second Additional Grand Jury of County of Kings [Cioffi],* 10 AD2d 425, affd 8 NY2d 220) and that the refusal to answer was intentional *(People v Einhorn,* 74 Misc 2d 958, revd on other grounds 45 AD2d 75, revd 35 NY2d 948) and the product of deliberate choice *(People v Ruggiano,* 39 AD2d 113). In both of the latter cases the necessary intent for conviction was deemed established where it was apparent from testimony adduced either at trial or at the Grand Jury proceeding that the defendant understood that his refusal to answer questions posed by the Grand Jury might result in a contempt citation.

Here, each of the defendants was granted immunity and sworn as a witness before the Grand Jury and each thereafter refused to answer any of the questions put despite being cautioned that a failure to answer could result in a contempt citation. In the face of this, the defendants assert that their intent to commit criminal contempt has not been proven beyond a reasonable doubt because Stewart's conflict of interest denied them the effective assistance of counsel.

■ Reliance on advice of counsel in refusing to testify constitutes no defense to a charge of criminal contempt nor is it relevant on the issue of intent *(People v Colombo,* 32 AD2d 812, affd 25 NY2d 641, vacated on other grounds 400 US 16; *People v Einhorn, supra).* Nevertheless, the trial court concluded that because of the "poisoned" legal advice defendants received the intent element of the crime had been negatived as to all but the second of the counts, and it is this divergency in findings upon which the defendants rely in urging reversal based on a repugnancy in verdicts. The People's response is that the defendants' refusals constituted multiple contempts, each involving a separate intent.

All of the questions in issue here were asked and all the refusals to answer took place within a brief period at the January 15, 1975 session of the Grand Jury. Since each series of questions and refusals were thus part of an ongoing short transaction between inquisitor and witness, the People's argument as to separate intent can only succeed if the questions underlying the second counts had factual predicates materi-

ally different from those underlying the remaining counts. To that degree the issue is what the People say it is—whether the refusal to answer each question constituted a separate crime requiring the formation of a separate intent.

■ The trial court's guilty verdicts were based upon the defendants' refusals to answer interrogatories concerning their acquaintance with certain named individuals who previously had been indicted. In contradistinction, however, the defendants were found not guilty on the counts which resulted from their refusals to answer questions about the criminal activities of the same persons. All of the questions pertaining to the indicted individuals were facets of a single basic inquiry —what the defendants knew about the indicted individuals. All of the refusals to answer questions about them thus fell within the same "area of refusal" and under prevailing precedents they constitute a single contempt.

The seminal "area of refusal" case is *Yates v United States* (355 US 66) in which the Supreme Court held that based upon her initial refusal to identify alleged Communists the petitioner had committed but a single contempt in refusing to answer questions about the Communist Party membership of nine individuals. In *People v Riela* (7 NY2d 571, app dsmd and cert den 364 US 474), which shortly followed *Yates,* the defendant who had been indicted on 17 different counts of contempt for refusal to answer that number of questions about the notorious Apalachin meeting, was held to have carved out an area of refusal which reduced his multiple refusals to a single act of criminal contempt. Declaring that it was irrelevant that the multiple questions were not simply rephrasals of a single question or that different answers were called for by each, Judge FULD wrote: "What is of significance is that it was apparent from the very start of his interrogation that Riela, relying upon the privilege, would decline to answer any question bearing on the 'Apalachin meeting', and that the questions, different though they were from one another, all related to that one subject. This being so, he is guilty of the single contempt of refusing to give testimony concerning the Apalachin gathering, rather than 17 contempts for refusal to answer individual questions about it." (7 NY2d, at p 576; see, also, *People v Chestnut,* 26 NY2d 481; *People v Epps,* 32 AD2d 625.)

When the *Riela* rationale is applied to the instant indictments it becomes clear that as each defendant refused to

answer the questions underlying the respective second counts as to whether he knew the named individuals he commenced carving out an area of refusal with reference to those persons and their activities, for having refused to acknowledge his acquaintance with them, it was obvious that he would decline to acknowledge familiarity with their alleged criminal dealings. In a similar scenario (*Baker v Eisenstadt*, 456 F2d 382, 393, cert den 409 US 846) the First Circuit relied upon *Riela* to hold that 43 refusals to answer were in reality a single contempt, stating: "The petitioner having refused to say whether he had met [the informant] in the fall of 1961 * * * it seems clear a fortiori that he would continue to refuse to answer questions getting closer and closer to the target."

The People's reliance on *People v Saperstein* (2 NY2d 210, cert den 353 US 946) is misplaced. In *Saperstein,* which preceded *Riela,* the defendant was indicted on five counts of contempt for his evasive answers before the Grand Jury with reference to questions about five separate telephone conversations with different persons. Affirming the multiple convictions, the Court of Appeals held that each conversation was the predicate for a separate contempt count but it declined to reach the question of whether each question concerning each conversation also could be the basis for a separate count. *Saperstein* is inapposite here because, unlike the current situation, each telephone conversation constituted a separate area of inquiry, and refusal to answer as to one did not necessarily mandate the conclusion that the witness would be evasive concerning the others.

It is apparent, then, that had the instant defendants been convicted on all counts relative to their refusal to answer questions concerning the persons referred to in each second count, only one such conviction against each defendant could have survived. But instead of convicting the defendants of a single count of contempt based on the original refusals to answer as to whether they knew the indicted individuals and dismissing the other counts which flowed from the initial refusal (see *People v Chestnut*, 26 NY2d 481, 492, *supra),* the trial court found guilt on the original refusal and acquitted on the others. Thus within the area of refusal—which must be considered as one continuous refusal and the basis for but a single contempt conviction—there are contradictory findings of guilt and nonguilt.

Finally, examination of the record reveals no rational the-

ory by which to distinguish between the defendants' intent in refusing to answer the original acquaintance questions and their intent in refusing to answer concerning their knowledge of the criminal activities of the individuals named. The defendants followed their lawyer's advice unwaveringly and refused to answer all questions. In these circumstances, the requisite intent for conviction existed for all refusals or it existed for none.

Since there is a clear repugnancy between the findings of guilt on the second count of each indictment and the findings of nonguilt on the third and seventh counts of the Dercole indictment, the third and fourth counts of the Lungarelli indictment, and the third, fourth and seventh counts of the Cianciola indictment, we are constrained to reverse the three convictions and dismiss the indictments against these defendants.

HOPKINS, J. P., COHALAN and MARTUSCELLO, JJ., concur.

Three judgments, one as to each defendant, of the Supreme Court, Queens County, all rendered May 16, 1977, reversed, on the law, indictments dismissed and cases remitted to the Supreme Court, Queens County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.