# LAMAR ROWE *v.* SUPERIOR COURT, JUDICIAL DISTRICT OF NEW HAVEN
## (SC 17718)

Rogers, C. J., and Katz, Palmer, Zarella and Schaller, Js.

Argued May 19—officially released December 9, 2008

*Neal Cone*, senior assistant public defender, for the plaintiff in error.

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the defendant in error.

*Opinion*

SCHALLER, J. The plaintiff in error, Lamar Rowe (plaintiff), brings this writ of error seeking reversal in part of the trial court's summary judgment of criminal contempt rendered pursuant to General Statutes § 51-33.[1] He contends that the trial court improperly found that he had committed a second, separate act of contempt for what was a single, continuing act of contempt in his repeated refusals to provide testimony as a witness in a criminal trial. The plaintiff contends that the second finding of contempt violates the common law, as well as his constitutional rights to due process and to protection against double jeopardy. We agree with the plaintiff's common-law claim, and, accordingly, we grant the writ of error.

---

[1] General Statutes § 51-33 provides: "Any court, including a family support magistrate, may punish by fine and imprisonment any person who in its presence behaves contemptuously or in a disorderly manner; but no court or family support magistrate may impose a greater fine than one hundred dollars or a longer term of imprisonment than six months or both."

The record reveals the following undisputed facts. On April 18, 2005, the plaintiff was picked up by the New Haven police department. At that time, he provided a statement to the police regarding the occupants and location of a black Acura on the evening of April 16, 2005, and on the morning of April 17, 2005. The state later brought charges against Hilbert Roberts, whom the plaintiff had identified as one of the occupants of the Acura, for a murder committed on April 17, 2005.

On July 26, 2006, pursuant to a subpoena issued by the state, the plaintiff appeared as a witness at Roberts' trial. Outside the presence of the jury, the state questioned the plaintiff. After eliciting one word responses to some background questions unrelated to the case,[2] the following exchange between the prosecutor and the plaintiff took place:

"Q. Do you know the defendant in this case . . . ?

"A. Plead the fifth.

"Q. On what grounds?

"A. I don't wanna to talk to you."

The state explained to the plaintiff that he could not assert a fifth amendment privilege against testifying unless his testimony might expose him to the possibility of criminal liability. The state then represented to the court that none of the questions it had posed, or intended to pose, would give rise to that possibility. The court therefore advised the plaintiff that, if he did not have a valid fifth amendment privilege and refused to testify, the court could find him in contempt, for

---

[2] The following exchange took place between the prosecutor and the plaintiff:

"Q. Hi, Mr. Rowe, how old are you?

"A. Twenty-two.

"Q. Okay. And you're currently in jail, right?

"A. Yeah."

which he could receive jail time. The plaintiff responded: "I refuse to testify." The court nonetheless gave the state permission to conduct further questioning. The state obtained one word responses to two questions as to whether the plaintiff previously had spoken with the state and whether the state had shown him the statement that he had given to the police. When the state asked the plaintiff to identify the statement, the plaintiff refused to respond, reiterated that he refused to testify, and repeatedly asserted that he did not want to respond to any of the state's questions. After the state persisted, the plaintiff sought the court's intervention. The court acquiesced to the state's request for some leeway, and the state posed another question, to which the plaintiff responded: "What did I just tell you? I ain't answering no questions, right?" The court declined the state's request to hold the plaintiff in contempt at that time. Instead, it decided to appoint a public defender to advise the plaintiff and to take the matter up the following morning.

On July 27, 2006, Thomas Farver appeared as the plaintiff's counsel. Farver informed the court that, although he believed that the plaintiff did have a potentially valid fifth amendment privilege, that privilege did not relate directly to the charges in Roberts' trial and, in any event, the plaintiff did not want to assert the privilege.[3] The court then stated to the plaintiff: "If you don't claim it, you run the risk of me putting you in jail, and I will tell you, you could be sentenced on each refusal to answer a question for up to six months . . . ." The state then posed the same question that the plaintiff had refused to answer the previous day: "[D]o you know the defendant in this case . . . ?" The plain-

---

[3] The plaintiff had expressed a concern that the state might bring criminal charges against him for matters on which he had asserted a fifth amendment privilege. Neither the trial court nor the state disabused the plaintiff of the possibility of that consequence.

tiff gave no response. The state asked the court to order the plaintiff to respond. After the court asked the plaintiff whether it was correct in understanding that he was not asserting a fifth amendment privilege as to this question, the plaintiff acknowledged that he knew Roberts.

The state next asked: "Did you see him . . . driving a black Acura Integra on April 16, 2005?" The plaintiff thrice stated, the latter two times in response to inquiries by the court, that he refused to answer that question. The court then asked: "Is there anything else you want to say before I impose sentence upon you for refusing to answer a direct order of the court to answer that question?" The plaintiff responded, "Yeah. I don't want to be asked no more questions." The court found the plaintiff in contempt and imposed a sentence of six months.

The state then continued questioning the plaintiff: "[D]id you see . . . the man sitting over there, without the glasses at the table, driving a black Acura Integra on Sunday morning, April 17, 2005?" The plaintiff twice refused to answer the question. The court ordered him to answer, explaining that the question "involves a separate date from the first one," but the plaintiff still refused to answer the question. The court made a second finding of contempt and imposed another six month sentence, consecutive to the sentence previously imposed. The state then asked Farver for the record: "[A]lthough I obviously know the answer to this question, is it your client's intention to answer no further questions . . . ?" The plaintiff responded affirmatively. The trial court thereafter terminated the proceedings and rendered judgment of guilty on two counts of contempt in accordance with its findings.

In this writ of error that followed, the plaintiff contends that the second finding of contempt violated the

common law, as well as his constitutional rights to due process and to protection against double jeopardy. We conclude that the plaintiff is entitled to prevail on his common-law claim. Therefore, we need not reach the constitutional issues raised. See *State* v. *Ritrovato*, 280 Conn. 36, 50, 905 A.2d 1079 (2006) (recognizing that "[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case" [internal quotation marks omitted]).

Before turning to the issues presented, we note the parameters of our review. "The present case, which involves a review of a summary criminal contempt proceeding, comes before us on a writ of error which is the sole method of review of such proceedings. . . . The scope of our review reaches only those matters appearing as of record. . . . In a review of summary criminal contempt, the inquiry is limited to a determination of the jurisdiction of the court below. . . . Subsumed in this inquiry are three questions, namely, (1) whether the designated conduct is legally susceptible of constituting a contempt . . . (2) whether the punishment imposed was authorized by law . . . and (3) whether the judicial authority was qualified to conduct the hearing." (Citations omitted; internal quotation marks omitted.) *Martin* v. *Flanagan*, 259 Conn. 487, 494, 789 A.2d 979 (2002).

I

We first must address a threshold question of mootness, which implicates this court's jurisdiction to entertain the writ. *Monsam* v. *Dearington*, 82 Conn. App. 451, 455, 844 A.2d 927 (2004). While the writ of error was pending before this court, the plaintiff finished serving both sentences for contempt. Although the parties agree that no practical relief can be afforded from the sentence already served, they disagree as to whether

the collateral consequences doctrine applies to provide a basis for jurisdiction. We conclude that a conviction of criminal contempt warrants application of this doctrine.

"When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *State* v. *Preston*, 286 Conn. 367, 374, 944 A.2d 276 (2008). "Where there is no direct practical relief available from the reversal of the judgment, as in this case, the collateral consequences doctrine acts as a surrogate, calling for a determination whether a decision in the case can afford the litigant some practical relief in the future." (Internal quotation marks omitted.) Id., 382–83. Under this doctrine, "the court may retain jurisdiction when a litigant shows that there is a reasonable possibility that prejudicial collateral consequences will occur. . . . [T]he litigant must establish these consequences by more than mere conjecture, but need not demonstrate that these consequences are more probable than not." (Citation omitted; internal quotation marks omitted.) Id., 382.

This court has not determined whether a record of criminal contempt alone gives rise to a reasonable possibility of prejudicial collateral consequences.[4] The

---

[4] In *Shays* v. *Local Grievance Committee*, 197 Conn. 566, 567, 571, 499 A.2d 1158 (1985), this court concluded that a writ of error challenging a criminal contempt order was rendered moot after the plaintiff in error had finished serving his sentence. The court stated in a footnote: "The plaintiff [in error] at oral argument expressly disavowed any claim that his writ of error might not be moot because of possible adverse legal consequences that might result from his contempt conviction. Where collateral legal disabilities are imposed as a matter of law because of a criminal conviction, it is well established that a case will not be declared moot, even where the sentence has been fully served. . . . Because contempt proceedings are not themselves criminal cases . . . *we assume, without deciding the matter*, that no such collateral consequences attend a conviction for contempt." (Citations omitted; emphasis added.) Id., 572 n.4. We note that *Shays* preceded this court's decision to adhere to a less rigid view of collateral consequences than the one that has evolved under more recent United States

Appellate Court has recognized, however, the possibility that such consequences may attach. See *Monsam* v. *Dearington*, supra, 82 Conn. App. 455. That court appeared to equate the consequences attendant to criminal contempt with those attendant to any other criminal conviction: "The writ of error is not moot in this case because collateral consequences from the judgment of contempt itself may arise in the future.

" 'It is well established that since collateral legal disabilities are imposed as a matter of law because of a criminal conviction, a case will not be declared moot even where the sentence has been fully served.' *Barlow* v. *Lopes*, 201 Conn. 103, 112, 513 A.2d 132 (1986). . . . This case is not moot because the collateral consequences of a criminal conviction are legion, involving possible heavier penalties in the event of future convictions, and might affect a wide range of civil rights." *Monsam* v. *Dearington*, supra, 82 Conn. App. 455–56. We generally agree with the Appellate Court's reasoning.

"[O]ur precedents make clear that 'a proceeding for [criminal] contempt, while it is of a criminal nature, is not a criminal prosecution.' " *State* v. *Murray*, 225 Conn. 355, 357 n.5, 623 A.2d 60, cert. denied, 510 U.S. 821, 114 S. Ct. 78, 126 L. Ed. 2d 46 (1993); see *State* v. *Jackson*, 147 Conn. 167, 169, 158 A.2d 166 (1960) (contempt is "an offense against the court as an organ of public justice and not for a violation of the criminal law"). Nonetheless, "[c]riminal contempt is a crime in the ordinary sense; *Bloom* v. *Illinois*, 391 U.S. 194, 201, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968) . . . ." (Internal quotation marks omitted.) *Banks* v. *Thomas*, 241 Conn. 569, 590, 698 A.2d 268 (1997). Accordingly, this court

Supreme Court case law, which focuses on actual, necessary collateral consequences. See *State* v. *McElveen*, 261 Conn. 198, 205–12, 802 A.2d 74 (2002) (contrasting development of Connecticut case law with development of federal case law).

long has recognized that "[p]roceedings for the punishment of contempts should generally conform as nearly as possible to proceedings in criminal cases . . . ." *McCarthy* v. *Hugo*, 82 Conn. 262, 266, 73 A. 778 (1909); accord *State* v. *Murray*, supra, 357 n.5 (criminal contempt proceeding "requires most of the usual procedural protections inherent in a prosecution for a crime"). Like any other criminal conviction, a finding of criminal contempt results in a criminal record. See *Doral Produce Corp.* v. *Paul Steinberg Associates, Inc.*, 347 F.3d 36, 44 (2d Cir. 2003). These principles support the conclusion that at least some of the prejudicial collateral consequences that flow from convictions in a criminal prosecution also are reasonably likely to flow from a criminal contempt conviction.[5] See *State* v. *Meyer*, 31 Or. App. 775, 777 n.1, 571 P.2d 550 (1977) (appeal from contempt conviction not moot after sentence served because conviction had collateral consequences beyond jail term).

The state, however, asserts several arguments for distinguishing criminal contempt generally and the plaintiff's contempt specifically from the rationale for applying the collateral consequences doctrine to other criminal convictions. The state contends that a condemnor may file a motion to stay his contempt sentence to avoid mootness, and that criminal contempt records are not readily accessible. It further contends that the

---

[5] We recognize that contempt under federal law can carry a more serious penalty than under Connecticut law. Under federal law, there is no maximum term of imprisonment for contempt; see 18 U.S.C. § 401; whereas under § 51-33, the maximum term is six months, which would be viewed by the United States Supreme Court as a "petty offense"; *Bloom* v. *Illinois*, supra, 391 U.S. 197–98; and by our court as a misdemeanor. See General Statutes § 53a-26 (a). Because of the lesser punishment and classification under state law, we do not presume that all of the consequences attendant to a federal contempt conviction necessarily would arise in a contempt conviction under Connecticut law. Nonetheless, even a misdemeanor gives rise to a criminal record that can have prejudicial consequences.

plaintiff is unlikely to suffer prejudicial consequences from the challenged contempt order in employment contexts or in other court proceedings beyond any prejudice he would suffer from his other unchallenged contempt conviction and his other criminal convictions. We are not persuaded by the state's arguments.

First, while it undoubtedly would be in a contemnor's interest to file for a stay of a contested contempt sentence; see, e.g., *State* v. *Banks*, 59 Conn. App. 145, 147–48, 763 A.2d 1046 (2000); the state has pointed us to no authority holding that a party's efforts to avoid mootness dictate whether the collateral consequences doctrine may apply. Cf. *Hall* v. *Dichello Distributors, Inc.*, 6 Conn. App. 530, 538 n.9, 506 A.2d 1054 (noting that appellants might have avoided mootness question by filing motion for stay, but not holding that failure to do so bore on mootness determination), cert. denied, 200 Conn. 807, 512 A.2d 230 (1986). Second, even if we were to assume that a record of criminal contempt is not readily accessible to the public, it undoubtedly would be available to the courts in any proceeding in which the contemnor later appeared. See *State* v. *Flanagan*, 19 Kan. App. 2d 528, 529–30, 873 P.2d 195 (1994) ("We recognize that the judicial system is an integral part of American life, and a criminal contempt conviction cannot help but affect a defendant's life if he or she appears before a judge who becomes aware of that conviction. That fact, and other possible collateral consequences of this conviction, are too obvious to declare this appeal moot simply because [the] defendant cannot be subjected to additional jail time."). In addition, the lack of public access would not relieve the contemnor of the obligation to answer affirmatively to employment applications asking whether he has a criminal record. See *Thompson* v. *United States*, 690 A.2d 479, 485 (D.C. 1997) ("[A] criminal contempt conviction has serious consequences for the contemnor. If asked about a crimi-

nal record on an employment application form, [the contemnor] is bound to disclose it." [Internal quotation marks omitted.]). Third, we will not speculate as to the point at which a contemnor's past criminal record becomes so weighty that we can assume that one contempt conviction would not tip the scales against the contemnor. Cf. *Sibron* v. *New York*, 392 U.S. 40, 56, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968) ("It is impossible for this [c]ourt to say at what point the number of convictions on a man's record renders his reputation irredeemable. And even if we believed that an individual had reached that point, it would be impossible for us to say that he had no interest in beginning the process of redemption with the particular case sought to be adjudicated."). We therefore conclude that the writ of error is not moot.

## II

We now turn to the issue presented in the writ, namely, whether it violated the common law for the trial court to find a second contempt. The plaintiff claims that his refusals to testify constituted one continuous act that was punishable only by a single finding of contempt. He contends that this continuous act was established by his blanket refusal to answer any questions. Alternatively, he claims that this continuous act was, at a minimum, an "area of refusal" that he had carved out with respect to testimony regarding his knowledge of Roberts' activities around the time of the incident for which he was being tried. If narrower consideration is required, he points to his refusals to answer questions on the same subject—Roberts' connection to a black Acura or his connection to the Acura on or about April 17, 2005—contending that the state cannot compound contempts by asking additional questions relating to the same subject on which the plaintiff already had refused to testify. The plaintiff contends that he preserved this claim for review, but requests

plain error review in the event that this court concludes otherwise. In response, the state asserts that this claim was not preserved and that plain error review is not appropriate because the issue is one of first impression under Connecticut common law. The state also contends that the plaintiff cannot prevail on the merits because his conduct was ambiguous, and he did not establish clearly the parameters of a purported area of refusal. We conclude that review of this claim is appropriate and that the trial court improperly found a second contempt.

A

We begin with the state's objection to review of this claim on the ground that the plaintiff failed to raise it at trial. It is well settled that "[o]ur case law and rules of practice generally limit this court's review to issues that are distinctly raised at trial. See, e.g., *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 550, 911 A.2d 712 (2006) (declining to consider claim not raised before habeas court); *State* v. *Fagan*, 280 Conn. 69, 85–89, 905 A.2d 1101 (2006) (declining to review claim not preserved at trial) [cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)]; Practice Book § 60-5 (court not bound to consider claim unless distinctly raised at trial)." *State* v. *Canales*, 281 Conn. 572, 579, 916 A.2d 767 (2007). We conclude that the plaintiff preserved his claim for review.

Before the trial court rendered its second finding of contempt, Farver stated the following objection: "I understand that the likelihood is that the court will find us in contempt, but I think that . . . *this question basically, it's essentially the same fact scenario and it is just rewording the question,* and under those circumstances I would ask the court not to impose a sentence that is consecutive to the prior contempt because *it's all one set of circumstances that's being questioned*

*about, and obviously [the state] can ask the question fifteen different ways or more, and—it would be unfair to impose . . . any additional time for that.*" (Emphasis added.) The court responded: "I agree with that except we haven't reached that point . . . . This is a separate date than the first question. They are both relevant. They are independently relevant, and while I am concerned about the possibility . . . you raise, this is not that situation."

Although the objection was not stated particularly artfully and can be read to be internally inconsistent,[6]

[6] Farver appears to have conceded initially that the trial court properly could make a second finding of contempt, but then argued that the trial court should not impose a second sentence. Because a second sentence *necessarily* would have been imposed as a result of a second finding of contempt, this argument is somewhat ambiguous and appears internally inconsistent. Nonetheless, for the reasons stated in this opinion, we conclude that the trial court's response indicated that it understood the essence of the plaintiff's claim. We disagree with the concurring opinion that Farver's objection and failure to correct the trial court's understanding of his objection unambiguously indicates his concession that the trial court properly could make a second finding of contempt. Farver may well have concluded that the trial court narrowly viewed the scope of questions that constitute the same subject matter for purposes of a separate finding of contempt.

Moreover, given the summary nature of the proceedings and the fact that this issue is one of first impression, we decline to construe this ambiguity against the plaintiff. Cf. *Banks* v. *Thomas*, supra, 241 Conn. 599 n.29 (citing "the summary nature of the [contempt] proceedings" as part of rationale for reviewing claim not raised before trial court). The preservation rule should be applied less stringently in this unusual context. As a nonparty, the plaintiff's failure to assert more clearly the particular objections that he now raises before us could not be part of a purposeful trial strategy. Cf. *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007) ("[t]o allow [a] defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the trial court] with that claim on appeal" [internal quotation marks omitted]); *Jones* v. *Ippoliti*, 52 Conn. App. 199, 205 n.12, 727 A.2d 713 (1999) ("defendants never raised this issue at trial but instead held that arrow in their appellate quiver, while reaping the benefit of a full trial"). Review of his claim does not implicate concerns of judicial economy because success on the writ would not require a new trial. See *Lin* v. *National Railroad Passenger Corp.*, 277 Conn. 1, 13, 889 A.2d 798 (2006) ("[t]he purpose of the [preservation requirement] is to alert the court to any claims

the plaintiff did assert the narrowest theory of the claim that he raises in this writ of error—namely, that he should not be punished for multiple contempts when the state was seeking to elicit essentially the same information, or information on the same subject, by posing the question differently. The trial court appears to have understood and rejected this argument because, in its view, multiple contempts were proper as long as the questions sought to elicit information that had any independent relevance. Under such circumstances, we can-

of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials" [internal quotation marks omitted]).

The concurrence focuses exclusively on its view of the trial court's understanding of the *relief* being sought, without considering the court's understanding of the *basis* of that request for relief. Based on the concurrence's view of the record, the trial court's response—"we haven't reached that point"—apparently would mean that the court recognized that it might reach a point where it would find it proper to make additional *findings* of contempt, but improper to impose *consecutive sentences* for those contempts. A far more reasonable interpretation of that response is that the trial court recognized that a point could be reached when the plaintiff's refusals to answer questions relating to the same subject no longer could be punished as separate acts.

Despite the concurrence's myriad categorical assertions, we will not be drawn into speculating as to how we would have construed the record had: (1) the trial court evidenced its understanding of Farver's argument by finding a second contempt but ordering punishment other than a consecutive sentence; and (2) Farver made no attempt to address the second finding of contempt. Other such courses of events would be guided by different jurisprudential considerations. See *State* v. *T.D.*, 286 Conn. 353, 359, 944 A.2d 288 (2008), citing 5 Am. Jur. 2d 39, Appellate Review § 243 (2007) ("[o]ne who has received in the trial court all the relief that he or she sought therein is not aggrieved by the judgment and has no standing to appeal" [internal quotation marks omitted]); *Seymour* v. *Seymour*, 262 Conn. 107, 111, 809 A.2d 1114 (2002) ("[a] party cannot be aggrieved by a decision that grants the very relief sought" [internal quotation marks omitted]). The plaintiff did not obtain *any* relief related to the second finding of contempt, irrespective of how one views Farver's comments.

Finally, we note that the concurrence reaches this common-law claim as a necessary predicate to its double jeopardy analysis. That being the case, there seems to be little gained through its stringent view of preservation under the facts of this case.

not conclude that the plaintiff has ambushed the trial court by seeking reversal of an issue that he had failed to raise at trial. See *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007) ("[t]o allow [a] defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the trial court] with that claim on appeal" [internal quotation marks omitted]). Although we are mindful that the plaintiff did not raise all of the theories that he raises in his writ as to why his conduct should be deemed a single act of contempt, those theories are related to a single legal claim. See *State* v. *Mitchell*, 169 Conn. 161, 168, 362 A.2d 808 (1975) (reaching ground not raised at trial because it was related to preserved claim raised on appeal), overruled in part on other grounds by *State* v. *Higgins*, 201 Conn. 462, 472, 518 A.2d 631 (1986); *In re Jason S.*, 9 Conn. App. 98, 107–108, 516 A.2d 1352 (1986) (same); cf. *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 569, 916 A.2d 5 (addressing alternate ground for affirmance not raised at trial because, inter alia, issue was "closely intertwined" with certified question), on remand, 102 Conn. App. 863, 927 A.2d 958 (2007); *State* v. *Bethea*, 24 Conn. App. 13, 17 n.2, 585 A.2d 1235 (reviewing issue not raised at trial but subsumed within issue raised), cert. denied, 218 Conn. 901, 588 A.2d 1076 (1991). Indeed, as the discussion in part II B of this opinion demonstrates, there is substantial overlap between these theories under the case law. Therefore, the plaintiff has preserved this claim for review.

B

Accordingly, we now turn to the merits of the plaintiff's claim that his refusal to answer the question that led to the second contempt was part of a single, continuous act of contempt. Although we have not addressed this precise issue, we are guided by jurisprudence developed in the federal and state courts. The seminal case

in this area is *Yates* v. *United States*, 355 U.S. 66, 78 S. Ct. 128, 2 L. Ed. 2d 95 (1957). In that case, while testifying in her own defense on June 26, 1952, the petitioner was adjudged guilty of civil contempt after refusing to answer questions about whether a nonparty and a codefendant were members of the Communist party. Id., 68. The trial court ordered the petitioner to be committed to jail through the remainder of her trial unless she purged herself of the contempt by answering the questions. Id., 68–69. Prior to the court's finding of contempt, the petitioner had explained that she could not be responsible for causing harm to others and that, "[h]owever many times [she was] asked and in however many forms, to identify a person as a communist, [she could not] bring [her]self to do it . . . ." (Internal quotation marks omitted.) Id., 68. During further testimony on June 30, 1952, the petitioner refused to answer eleven questions that would have caused her to identify nine persons as members of the Communist party. Id., 69. She reiterated her previously stated rationale, but expressed willingness to answer similar questions as to others who would not be hurt by such identification and in fact provided such testimony. Id. The trial court treated each of the eleven refusals as a separate contempt and imposed one year terms of imprisonment for each, to run concurrently. Id., 70. On appeal, the petitioner claimed, inter alia, that "her several refusals to answer on both June 26 and June 30 constituted but a single contempt which was total and complete on June 26, so that imposition of contempt sentences for the June 30 refusals was in violation of due process."[7]

[7] Although the United States Supreme Court reversed ten of the eleven contempt convictions, the court never referred to due process or terms embodying due process principles in its analysis, but referred to due process only when stating the basis of the petitioner's claims. *Yates* v. *United States*, supra, 355 U.S. 71–73. Moreover, the two circuit court cases that the United States Supreme Court cited as setting the relevant legal parameters were not decided on due process grounds. See *United States* v. *Orman*, 207 F.2d 148 (3d Cir. 1953); *United States* v. *Costello*, 198 F.2d 200 (2d Cir.), cert. denied, 344 U.S. 874, 73 S. Ct. 166, 97 L. Ed. 677 (1952). The court in *Yates*

Id., 71. Specifically, she contended that she had " 'carved out' " an "area of refusal," i.e., identifying others as communists. Id., 73.

In reversing ten of the eleven criminal contempt convictions, the United States Supreme Court explained: "A witness, of course, cannot 'pick and choose' the questions to which an answer will be given. The management of the trial rests with the judge and no party can be permitted to usurp that function. . . . However, it is equally clear that the prosecution cannot multiply contempts by repeated questioning on the same subject of inquiry within which a recalcitrant witness already has refused answers. See *United States* v. *Orman*, 207 F.2d 148 [(3d Cir. 1953)].[8]

did refer to double jeopardy in its analysis, a claim not raised directly by the petitioner. *Yates* v. *United States*, supra, 74. The court never stated expressly, however, that it was deciding the case on a different basis than that raised by the petitioner. As a result, there is not a consensus among courts as to whether *Yates* was decided on due process grounds. Compare *In re Keller*, 49 Cal. App. 3d 663, 667, 123 Cal. Rptr. 223 (1975) ("*Yates* was not decided on constitutional grounds but on an interpretation of federal statutes and rules") with *United States* v. *Coachman*, 752 F.2d 685, 688 n.20 (D.C. Cir. 1985) ("[s]ince [the petitioner in *Yates*] had argued that the multiple contempt convictions violated the [f]ifth [a]mendment's [d]ue [p]rocess [c]lause, the [c]ourt rested its decision upon that provision rather than upon the [d]ouble [j]eopardy [c]lause, but recognized that the latter might be implicated by the facts of the case"); *People* v. *Fields*, 177 Ill. App. 3d 129, 135, 533 N.E.2d 48 (1988) ("[in *Yates*], that [c]ourt held the imposition of [eleven] consecutive findings of contempt of a party for refusing to answer questions as to whether [eleven] different people were members of the Communist [p]arty deprived him of due process") (modified and reh. denied January 13, 1989); *Ex parte Thompson*, Court of Appeals, Docket No. AP-75,720, 2008 WL 696476, *3 (Tex. Crim. App. March 5, 2008) ("*Yates* establishes, as a matter of due process, that only one contempt occurs"). Indeed, if *Yates* was decided on due process grounds, the more stringent standard for substantive due process subsequently articulated by the Supreme Court raises the question of whether *Yates* would retain its vitality, at least as applied to a sentence less egregious than the eleven year contempt sentence at issue in that case. In light of these questions, it seems unwise to decide this case on due process grounds, as the concurrence has chosen to do, when the case can be decided on common-law grounds.

[8] In *United States* v. *Orman*, supra, 207 F.2d 152, the witness twice had refused to answer the same question and subsequently was found guilty of

"Even though we assume the [g]overnment correct in its contention that the [eleven] questions in this case covered more than a single subject of inquiry, it appears that every question fell within the area of refusal established by [the] petitioner on the first day of her cross-examination. The [g]overnment admits, pursuant to the holding of *United States* v. *Costello*, 198 F.2d 200 [(2d Cir.), cert. denied, 344 U.S. 874, 73 S. Ct. 166, 97 L. Ed. 677 (1952)], that only one contempt would result if [the petitioner] had flatly refused on June 26 to answer any questions and had maintained such a position. We deem it a fortiori true that where a witness draws the lines of refusal in less sweeping fashion by declining to answer questions within a generally defined area of interrogation, the prosecutor cannot multiply contempts by further questions within that area. The policy of the law must be to encourage testimony; a witness willing to testify freely as to all areas of investigation but one, should not be subject to more numerous charges of contempt than a witness unwilling to give any testimony at all.

"Having once carved out an area of refusal, [the] petitioner remained within its boundaries in all her sub-

two counts of criminal contempt for those refusals. In reversing the second contempt, the court noted that "where the separate questions seek to establish but a single fact, *or relate to but a single subject of inquiry*, only one penalty for contempt may be imposed." (Emphasis added.) Id., 160. As support for the broader subject of inquiry rule, the court in *Orman* cited *United States* v. *Abe*, 95 F. Sup. 991 (D. Haw. 1950). In that case, the witness had made "separate refusals to answer questions pertaining to the same general subject matter," namely, whether certain persons were members of the Communist party. Id., 992. The District Court concluded: "[A]s the questions appear to be directed all to one subject of inquiry and the answers were simultaneous during the proceedings, and continuous acts, the indictments therefore charge only one alleged offense. . . . [Circuit Court precedent] strongly indicate[s] that no matter how many refusals to answer may occur in an examination such as is alleged, the maximum sentence that could be imposed pursuant to the [s]tatute involved . . . would be punishment for not more than one refusal." (Citations omitted.) Id.

sequent refusals. The slight modification on June 30 of the area of refusal did not carry beyond the boundaries already established. Whereas on June 26 the witness refused to identify other persons as [c]ommunists, on June 30 she refused to do so only if those persons would be hurt by her identification. Although the latter basis is not identical to the former, the area of refusal set out by it necessarily fell within the limits drawn on June 26. We agree with [the] petitioner that only one contempt is shown on the facts of this case.

"That conclusion, however, does not establish [the] petitioner's contention that no contempt whatsoever was committed by her refusal to answer the [eleven] questions of June 30. The contempt of this case, although single, was of a continuing nature: each refusal on June 30 continued the witness' defiance of proper authority. Certainly a party who persisted in refusing to perform specific acts required by a mandatory injunction would be in continuing contempt of court. We see no meaningful distinction between that situation and [the] petitioner's persistent refusal to answer questions within a defined area." (Citation omitted.) *Yates* v. *United States*, supra, 355 U.S. 73–74.

To summarize, *Yates* recognized three circumstances in which multiple refusals to testify may be punished only as a single act of contempt: when the witness refuses to give any testimony at the outset and adheres to that refusal (blanket refusal); when the witness refuses to give testimony "within a generally defined area of interrogation" (area of refusal); id., 73; and when the witness refuses to answer questions relating to the same fact or subject of inquiry (subject of inquiry). Id. Although in *Yates*, the witness expressly had identified the subject matter on which she would not testify; id., 68; the court did not indicate whether such express identification is a necessary predicate to establishing

a single, continuous contempt for which only one punishment could be assessed.

The case law that has developed subsequent to *Yates* reflects that the courts have found these circumstances established under widely varied facts. For example, a court will conclude that a witness has established an area of refusal when she expressly has identified at the outset the subject on which she refuses to testify, as in *Yates*. See, e.g., *United States* v. *Coachman*, 752 F.2d 685, 689 (D.C. Cir. 1985); *In re Keller*, 49 Cal. App. 3d 663, 665–66, 123 Cal. Rptr. 223 (1975); *In re Contempt Findings Against Schultz*, 428 N.E.2d 1284, 1290–91 (Ind. App. 1981); *People* v. *Riela*, 7 N.Y.2d 571, 576–78, 166 N.E.2d 840, 200 N.Y.S.2d 43, appeal dismissed and cert. denied, 364 U.S. 474, 81 S. Ct. 242, 5 L. Ed. 2d 221 (1960). Some courts also appear to have concluded, however, that an area of refusal can be established when a witness makes no such express statement but her refusals to answer questions pertaining to the same subject matter gradually carve out an area of refusal. See, e.g., *People* v. *Fields*, 177 Ill. App. 3d 129, 136, 533 N.E.2d 48 (1988) ("[N]o absolute refusal to testify to any question occurred until [the] contemnor was ordered to state who accompanied him in the El Paso burglary. The court and the prosecutor were not required to assume that because [the] contemnor was willing to subject himself to contempt sanctions for refusal to answer that question, he was also willing to subject himself to punishment for refusal to [answer] a question as to how he entered the El Paso building. However, when [the] contemnor refused to testify as to whether [the defendant] participated in the El Paso burglary and later refused to tell how many people were with him in committing that burglary, [the] contemnor was refusing to answer questions encompassed by an area which had been 'carved out' by his previous refusals.") (modified and reh. denied January 13, 1989); *People* v. *Dercole*,

72 App. Div. 2d 318, 335–36, 424 N.Y.S.2d 459 (1980) ("as each defendant refused to answer the questions . . . as to whether he knew the named individuals he commenced carving out an area of refusal with reference to those persons and their activities, for having refused to acknowledge his acquaintance with them, it was obvious that he would decline to acknowledge familiarity with their alleged criminal dealings"), appeal dismissed, 52 N.Y.2d 956, 419 N.E.2d 869, 437 N.Y.S.2d 966 (1981); see also *Baker* v. *Eisenstadt*, 456 F.2d 382, 393 (1st Cir.) ("[t]he petitioner having refused to say whether he had met [the informant] in the fall of 1961 . . . it seems clear a fortiori that he would continue to refuse to answer questions getting closer and closer to the target" [citation omitted; internal quotation marks omitted]), cert. denied, 409 U.S. 846, 93 S. Ct. 118, 34 L. Ed. 2d 87 (1972).

Most often, however, when the witness has not identified a subject on which she will not testify, the courts have considered whether the questions that the witness has refused to answer relate to the same subject of inquiry. The courts agree that only one contempt may be found when the questioner seeks to establish the same fact by repeating or rewording the question. See, e.g., *United States* v. *Orman*, supra, 207 F.2d 160; cf. *People* v. *Saperstein*, 2 N.Y.2d 210, 219, 140 N.E.2d 252, 159 N.Y.S.2d 160 (affirming conviction of five separate counts of contempt when defendant had refused to identify speakers in five separate telephone conversations), cert. denied, 353 U.S. 946, 77 S. Ct. 825, 1 L. Ed. 2d 856 (1957). Similarly, most courts seem to agree that only one contempt may be found when the questions could establish the same fact directly or by inference. See, e.g., *United States* v. *Kamin*, 135 F. Sup. 382 (D. Mass. 1955); *Chance* v. *State*, 382 So. 2d 801 (Fla. App. 1980); *Fawick Airflex Co.* v. *United Electrical, Radio & Machine Workers of America, Local 735, C.I.O.*, 56

Ohio L. Abs. 419, 426, 92 N.E.2d 431, appeal dismissed, 154 Ohio St. 206, 93 N.E.2d 480 (1950). Other courts conclude that only one contempt may be found even when the questions relate to a broadly defined incident or interconnected but independently relevant facts. See, e.g., *In re Contempt of Armentrout*, 480 N.W.2d 685, 689 (Minn. App. 1992); *State* v. *Case*, 100 N.M. 173, 175, 667 P.2d 978 (App. 1983); *State* v. *Urioste*, 95 N.M. 712, 715–16, 625 P.2d 1229 (App. 1980). The United States Court of Appeals for the First Circuit has criticized the varying applications of the subject of inquiry approach, noting: "The rationale of the decided cases is most often descriptive of the result reached rather than of prescriptive value for future cases. . . .

"While such a conclusory formulation as single subject or single line of inquiry, or same subject matter may be sufficient to describe the disposition of cases in which a prosecutor has simply reframed in various forms a question addressed to whether the witness was a [c]ommunist, it is less helpful when different but additionally relevant and interconnected facts are sought to be elicited. The concept of a single subject is frustratingly open-ended, there being infinite ways of categorizing information in terms of time, place, incident, transaction, people, etc. Moreover, the use of such phrases as single subject as the basis for defining a contumacious refusal to testify involves the invocation of a wooden rubric devoid of any relation to policy." (Citations omitted; internal quotation marks omitted.) *Baker* v. *Eisenstadt*, supra, 456 F.2d 390–91.

We agree with the aforementioned policy considerations. Although a witness cannot pick and choose which questions to answer, repeated refusals to testify in the course of the same proceeding should not be treated as more than a single act of criminal contempt when the witness refuses to answer any questions at all or, alternatively, multiple questions that relate to a single

subject. We also agree with the First Circuit's criticism, however, that a retrospective identification of a subject of inquiry is too elastic a concept. That approach undermines two policy considerations. First, it could lead to inconsistent results and implicate the often voiced concerns about the potential for abuse of the contempt power. See *Bloom* v. *Illinois*, supra, 391 U.S. 202 ("The court has long recognized the potential for abuse in exercising the summary power to imprison for contempt . . . . [C]are is needed to avoid arbitrary or oppressive conclusions." [Citation omitted; internal quotation marks omitted.]); *Banks* v. *Thomas*, supra, 241 Conn. 588 ("[T]he United States Supreme Court has indicated that it is wary of the [summary contempt] power and cognizant of its potential for abuse. It, therefore, became established early in American jurisprudence that contempt limits a court in such cases to the least possible power adequate to the end proposed." [Internal quotation marks omitted.]). Second, it is unfair to the trial courts to apply a standard that can be viewed effectively only in retrospect. The proponent of the questions knows the subjects on which she intends to elicit testimony, and the witness knows the subjects on which he will refuse to testify. The trial court, however, does not have the benefit of such knowledge as the questions and refusals take place. Unlike the trial courts, appellate courts have the advantage of a perspective gained in hindsight, viewing in concert the totality of the unanswered questions.

In a related context, this court cautioned: "Although endowed with the authority to impose consecutive sentences of contempt for consecutive incidents of misconduct, the trial court should ordinarily temper its recourse to that power with the exercise of judicial restraint. Whenever possible, the trial court should rely on its superior ability to defuse confrontation in lieu of invoking its power to impose sanctions for contempt."

*Jackson* v. *Bailey*, 221 Conn. 498, 512–13, 605 A.2d 1350, cert. denied, 506 U.S. 875, 113 S. Ct. 216, 121 L. Ed. 2d 155 (1992).[9] Therefore, we conclude that, in order to avoid arbitrary results, encourage testimony and defuse confrontation, the trial court should conduct an inquiry when a witness refuses to provide testimony, whether that refusal is by way of a blanket refusal, an area of refusal or a single refusal that ultimately may relate to a broader subject of inquiry. By first determining the subjects on which the proponent intends to question the witness and then the extent to which the witness refuses to testify as to those matters, the court has information at the outset to assess the ensuing proceedings. If the witness states an intention to refuse to answer any questions or questions relating to a particular subject of inquiry, and acts consistently with that position, only one contempt may be found. A witness may not, however, pick and choose questions or subjects of inquiry to answer. If the witness' testimony is

---

[9] In *Jackson* v. *Bailey*, supra, 221 Conn. 511–12, the court rejected a contemnor's challenge to three separate findings of contempt and a fifteen month sentence for a series of obscene remarks directed to the court, wherein the contemnor had claimed, inter alia, that his conduct was "an undifferentiated mass of contemptuous behavior" for which no more than the statutory maximum for a single contempt could be imposed. (Internal quotation marks omitted.) The trial court had made a specific finding that the contempts were "separate and distinct." (Internal quotation marks omitted.) Id., 512. This court declined to subject that finding to scrutiny, agreeing with federal case law reasoning that "the standards of such a review will be amorphous, and the result will be inconsistency of decision. There is hardly anything inevitable about whether disruptive activity occurring during the course of a single trial is viewed as a continuous course of conduct or as a series of isolated instances, and we are at a loss to devise a satisfactory test with which to make that judgment." (Internal quotation marks omitted.) Id. In contrast to the unprovoked outbursts in *Jackson*, in cases in which contempt is found for a refusal to testify, there is a workable test to determine whether the acts are of a single, continuous nature, and the proponent of the questions in essence provokes the contempt by repeated questioning on a subject that the witness has stated an intention not to address. See *Yates* v. *United States*, supra, 355 U.S. 73 ("prosecutor cannot multiply contempts by further questions within that area").

not consistent with her initial representations to the court, the trial court properly may consider the refusals as separate acts of contempt to the extent necessary to manage the courtroom proceedings. Moreover, trial courts still have the remedy of civil contempt available to them. See General Statutes § 51-35 (a) ("[a]ny court or family support magistrate may commit to a community correctional center any person legally summoned who refuses to appear and testify before it in any case, there to remain at his own expense until he so testifies"); see also *Ullmann* v. *State*, 230 Conn. 698, 706, 647 A.2d 324 (1994) ("a refusal to testify may, at the discretion of the trial judge, be the ground for finding either civil or criminal contempt depending on the exigencies of a particular situation").

Turning to the present case, although the trial court did not inquire as to the state's intent, the court did conduct an inquiry of the plaintiff, who declared at the outset that he did not intend to provide any testimony relative to the criminal charges against Roberts. At the July 26 hearing, after the trial court informed the plaintiff that he likely did not have a valid fifth amendment privilege and therefore could be subjected to a finding of contempt, the plaintiff responded to the state's questions that he "refuse[d] to testify" and did not want to answer "none of your questions." In the exchange that immediately followed, the plaintiff emphasized that he previously had informed the state that he wanted nothing to do with "this," which clearly meant the case being brought against Roberts, and still held that position. Upon questioning by the court, the plaintiff plainly indicated that he did not intend to answer any questions.[10]

---

[10] The transcript of the July 26 hearing reflects the following exchange between the plaintiff, the court and the prosecutor:

"[The Plaintiff]: I refuse to testify.

"The Court: All right. . . .

"[The Prosecutor]: Can I ask him some questions?

"The Court: Sure.

"[The Prosecutor]: I hear you . . . but we spoke the other day, right?

"[The Plaintiff]: Yeah.

"[The Prosecutor]: And just downstairs in this building? Brought you in from jail, brought you up in the elevator?

"[The Plaintiff]: Yeah.

"[The Prosecutor]: Right? We spoke. Okay. I showed you this.

"[The Plaintiff]: Uh huh. (Affirmative)

"[The Prosecutor]: Okay. . . .

"[The Prosecutor]: Right, we showed you this [marked exhibit]? Right? And you recognized it, right? It's a statement that was—it's a transcription of a statement . . . that you gave to the police, right? You're shaking your head yes?

"[The Plaintiff]: Yeah. I refuse to testify.

"[The Prosecutor]: All right. I understand that.

"[The Plaintiff]: I don't wanna answer none of your questions.

"[The Prosecutor]: I understand that you don't want anything to do with this, but you did give this statement to the police at a previous time, right?

"[The Plaintiff]: I don't wanna answer none of your questions.

"[The Prosecutor]: But the other day you answered them, didn't you? Downstairs, right?

"[The Plaintiff]: I told you the same thing. I don't want nothing to do with this.

"[The Prosecutor]: Well, I know you said the same thing, but when we were downstairs, you acknowledged that, just as you have here, as being your statement, right? Right? This man right here was sitting next to me, along with another man from my office, right, right in this building?

"[The Plaintiff]: Yeah.

"[The Prosecutor]: Okay. And at that time you told me you didn't want anything to do with this?

"[The Plaintiff]: Just like right now, I'm telling you I want to go back downstairs.

"[The Prosecutor]: Just like now, exactly right. Exactly right, and I explained to you that I was going to bring you back and make you sit there, right?

"[The Plaintiff]: Uh huh. (Affirmative)

"[The Prosecutor]: And you said you weren't going to testify, right? This is all what happened three or four days ago?

"[The Plaintiff]: So you're gonna make me sit here?

"[The Prosecutor]: Well, you are sitting there, aren't you?

"[The Plaintiff]: Alright. That's what I'm gonna do then, so you might as well just stop asking me questions. . . .

"[The Plaintiff]: Judge, you see I ain't answering no questions. Could—

"The Court: Well, I understand that. Anything else at this point . . . ?

"[The Prosecutor]: I'd like to keep going for a little while, Judge. I disagree. I don't think he's not answering any questions.

"The Court: You can ask a few more questions, but I understand, at this point, that he's not going to answer any of them.

"[The Plaintiff]: I'm letting you know ain't no more need for no more questions.

The next day, the plaintiff refused to answer every question posed to him except to affirm that he knew Roberts. We note that this response was obtained only after the court incorrectly instructed the plaintiff that he could be sentenced up to six months for every question that he refused to answer. More significantly, however, that one response was entirely consistent with the plaintiff's stated intention not to answer *any questions related to the case against Roberts*. Before the court made the first finding of contempt, the plaintiff unequivocally reiterated his position: "I don't want to be asked no more questions." He then refused to answer the next question that resulted in the second finding of contempt.

Because the subject on which the plaintiff refused to provide testimony was the only subject matter on which the state sought to elicit substantive testimony, the plaintiff's refusals can be viewed broadly—as either a blanket refusal or as an area of refusal regarding testimony relating to the case against Roberts. In this case, it is a distinction without a difference. Cf. *State* v. *Verdugo*, 124 Ariz. 91, 94, 602 P.2d 472 (1979) ("Although [the contemnor's] refusals to answer propounded questions were contemptuous, his actions constituted only one contempt. It was known to counsel before [the contemnor] was called that he would refuse to testify.");

---

"The Court: Are you telling the court . . . that no matter what question [the prosecutor] . . .

"[The Plaintiff]: I don't wanna answer him.

"The Court: —[the prosecutor] asks you, you're not—

"[The Plaintiff]: I'm not answering him.

"The Court: —going to answer—

"[The Plaintiff]: No questions.

"The Court: —one single question?

"[The Plaintiff]: No more questions, no. No, nothing."

The prosecutor then obtained the court's permission for some leeway, and asked the plaintiff to identify his voice on a tape recording. The plaintiff responded: "What did I just tell you? I ain't answering no questions, right?"

*In re Keller*, supra, 49 Cal. App. 3d 668 (witness "specifically advised the judge, as he had advised the prosecutor before trial, that he was not going to testify 'regarding the incident,' which can only reasonably be interpreted to be a refusal to testify as to any matter concerning his perceptions of the crime for which the defendant was being tried"). Indeed, the issue is not whether the two unanswered questions that led to the contempts had independent relevance because they related to different days, as the trial court concluded. Rather, it is whether, after the plaintiff refused to answer the question seeking to link Roberts to the Acura the day before the shooting, the state reasonably could have believed that he would answer the question seeking to link Roberts to the Acura the day of the shooting. The state reasonably should have known, however, that the plaintiff "would . . . refuse to answer questions getting closer and closer to the target." *Baker* v. *Eisenstadt*, supra, 456 F.2d 393. We conclude that the trial court improperly found two contempts for a single, continuous act of contempt.

The writ of error is granted, the judgment is reversed in part, and the case is remanded with direction to vacate the second judgment of contempt.

In this opinion ROGERS, C. J., and KATZ, J., concurred.

PALMER, J., with whom ZARELLA, J., joins, concurring. The majority concludes that counsel for the plaintiff in error, Lamar Rowe (plaintiff), properly objected to the trial court's second contempt finding on the ground that that finding violated the common-law prohibition against multiple findings of contempt arising out of a witness' blanket refusal to answer questions or refusal to answer repeated questions pertaining to the same area or subject of inquiry. Having determined that

this claim was preserved for purposes of appeal, the majority resolves the claim in favor of the plaintiff. I disagree with the majority that the plaintiff's counsel raised the common-law claim in the trial court that the plaintiff now raises on appeal. Although that claim is therefore unpreserved, the record is adequate for review of the plaintiff's constitutional claims, which, I believe, are meritorious.[1] Accordingly, I would reverse the second finding of contempt but do so on constitutional, rather than common-law, grounds.[2]

Most of the essential facts and procedural history are set forth in the majority opinion. On April 18, 2005, the plaintiff was interviewed by detectives of the New Haven police department concerning a murder that had occurred the day before. Hilbert Roberts was a suspect in, and later charged with, that murder. During his interview, the plaintiff told the detectives that, between 9 and 10 p.m. on Saturday, April 16, 2005, he had seen Roberts and other men in a black Acura Integra that was located in the rear of a housing project on Congress Avenue in New Haven. The plaintiff also told the detectives that he had seen the black Acura on Sunday morning, April 17, 2005, between 9:30 and 11 a.m.

---

[1] Our jurisprudence concerning unpreserved constitutional claims is well established. Under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), "a defendant may prevail on unpreserved claims only if: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. The first two *Golding* requirements involve whether the claim is reviewable . . . and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Foreman*, 288 Conn. 684, 692–93 n.6, 954 A.2d 135 (2008).

[2] I agree with the majority's threshold conclusion in part I of its opinion that this appeal challenging the trial court's second contempt finding is not moot.

Thereafter, during Roberts' murder trial, the senior assistant state's attorney[3] called the plaintiff as a witness. Outside the presence of the jury, the plaintiff, who was not represented by counsel at that time, answered several questions, but, when asked about Roberts, he asserted his fifth amendment privilege against self-incrimination, indicating that he did not want to testify. Even though the court informed the plaintiff that the fifth amendment was inapplicable and that he could be held in contempt of court if he refused to answer questions for which no valid privilege existed, the plaintiff nevertheless persisted in his refusal to testify. The trial court denied the assistant state's attorney's request to hold the plaintiff in contempt at that time, however, and indicated that counsel would be appointed for him.

The next day, the plaintiff appeared in court with appointed counsel, Thomas Farver. After the plaintiff resumed the witness stand outside the presence of the jury, Farver informed the court that, although he believed that the plaintiff potentially had the right to invoke his fifth amendment privilege against self-incrimination, the plaintiff did not wish to assert that privilege. The court apprised the plaintiff that he could be held in contempt and sentenced to up to six months in prison for each refusal to answer a question posed to him. The assistant state's attorney then asked the plaintiff whether he had seen Roberts driving a black Acura Integra on April 16, 2005, but the plaintiff stated that he did not wish to answer the question. The plaintiff made it clear, however, that he was not invoking his fifth amendment privilege against self-incrimination. The court then directed the plaintiff to answer the question, but he refused. The court asked the plaintiff if he had anything to say before being held in contempt and having sentence imposed. The plaintiff stated: "Yeah. I

[3] In the interest of simplicity, I refer to the senior assistant state's attorney as the assistant state's attorney throughout this opinion.

don't want to be asked no more questions." The court then held the plaintiff in contempt of court and imposed a six month term of imprisonment.

The assistant state's attorney then asked the plaintiff whether he had seen Roberts driving a black Acura Integra on the morning of Sunday, April 17, 2005. The plaintiff again refused to answer the question. The court directed him to do so, stating that "[i]t involves a separate date from the first [question]." When the plaintiff again refused, the court stated: "All right. Do you want to consult with [Attorney] Farver or be heard at all before I make a finding of contempt and pass sentence on you?" The plaintiff stated that he did not. Farver, however, interjected, stating, "Your Honor, I'd like to be heard . . . before you pass sentence." The court instructed Farver to proceed, and Farver stated: "I understand that the likelihood is that the court will find us in contempt, but I think that . . . this question basically, it's essentially the same fact scenario and it is just rewording the question, and under those circumstances I would ask the court not to impose a sentence that is consecutive to the prior contempt because it's all one set of circumstances that's being questioned about, and obviously, [the assistant state's attorney] can ask the question fifteen different ways or more, and . . . it would be unfair to impose . . . any additional time for that." The court responded: "I agree with that except we haven't reached that point, [Attorney] Farver. This is a separate date than the first question. They are both relevant. They are independently relevant, and while I am concerned about the possibility . . . you raise, this is not that situation." After holding the plaintiff in contempt of court a second time, the court sentenced him to a term of imprisonment of six months, to run consecutively to his first contempt sentence.[4]

---

[4] Following the imposition of this second sentence, and after the plaintiff had stated that he did not intend to answer any further questions, the

I

On the basis of this record, the majority concludes that Farver properly raised the claim that the plaintiff now pursues on appeal, namely, that he lawfully could not be held in contempt a second time because his refusal to answer the question that resulted in the second contempt finding "was part of a single, continuous act of contempt." In other words, the majority concludes that Farver's argument placed the trial court on notice of the plaintiff's claim that the court was barred from holding him in contempt a second time. I respectfully submit that the record does not support the majority's conclusion.

As the record unambiguously demonstrates, Farver never maintained that the plaintiff was not subject to being held in contempt a second time. Indeed, Farver *never even suggested* that a second contempt finding would be improper; he indicated, in fact, that he expected the court to hold the plaintiff in contempt, and he sought to be heard only with respect to the appropriate sentence. Specifically, Farver argued that the plaintiff's refusal to answer the assistant state's attorney's question about the events of April 17, 2005, did not warrant the imposition of a sentence to run *consecutively* to the sentence that already had been imposed on the plaintiff for his refusal to answer the question about the events of April 16, 2005. The record is perfectly clear in this regard: Farver "ask[ed] the court not to impose a *sentence* that is *consecutive*" because, under the circumstances, it would have been "unfair" to do so. (Emphasis added.) The record is devoid of any claim or contention that a second contempt finding was improper; Farver's argument addressed only the fairness of the *sentence* to be imposed, not the impropriety of the underlying contempt *finding*.

assistant state's attorney indicated that he had no additional questions for the plaintiff, who then was excused.

Thus, the flaw in the majority's reasoning and conclusion stems from its failure to acknowledge the distinction between a finding of contempt, on the one hand, and the sentence imposed in connection with that contempt finding, on the other. In the trial court, Farver challenged only the propriety of a particular sentence; on appeal, the plaintiff challenges only the propriety of the second *finding* of contempt. Even if, consistent with Farver's request, the trial court had imposed no sentence, a suspended sentence or a concurrent sentence for that second contempt, the plaintiff's claim on appeal would be the same: the court lawfully could not make a second contempt *finding* because the plaintiff's refusal to answer the question about the events of April 17, 2005, was part of single act of contempt.[5] The majority fails to explain how Farver's request that the trial court impose no consecutive prison time in connection with the second contempt finding can be equated with the plaintiff's claim on appeal, namely, that the second contempt finding was improper.

In fact, the majority skirts this issue by broadly characterizing Farver's argument as one predicated on the contention that the plaintiff "should not be *punished for multiple contempts* when the [assistant state's attorney] was seeking to elicit essentially the same information, or information on the same subject, by posing the question differently." (Emphasis added.) The majority's use of the term "punished for multiple contempts" blurs the distinction between a finding of contempt and the sentence imposed for the contempt. As I have explained, in the present case, Farver did not object to a second contempt finding; he merely sought a sentence

---

[5] Indeed, as the majority correctly concludes, this case is properly before us only because of the collateral consequences attendant to "a conviction of criminal contempt . . . ." In other words, the contempt finding *itself* is the harm on which this appeal is predicated. The consecutive six month sentence that the court imposed in connection with the second contempt finding has no bearing on the merits of this appeal.

for the second contempt that was not consecutive to the sentence imposed for the first contempt. In other words, contrary to the assertion of the majority, Farver never maintained that the plaintiff could not be "punished for multiple contempts . . . ." Farver argued, rather, that the appropriate punishment for the second contempt was a punishment *other than* a consecutive sentence.

Despite the clarity of Farver's argument seeking to dissuade the trial court from imposing a consecutive sentence, the majority attempts to justify its result by asserting that, although Farver's claim was "somewhat ambiguous"; footnote 6 of the majority opinion; the argument nevertheless was sufficiently clear to place the trial court on notice that Farver *actually* was raising the same claim that the plaintiff raises on appeal, that is, that the trial court properly could not make a second contempt finding. In particular, the majority states: "Farver appears to have conceded initially that the trial court properly could make a second finding of contempt . . . but then argued that the trial court should not impose a second sentence. Because a second sentence *necessarily* would have been imposed as a result of a second finding of contempt, this argument is somewhat ambiguous and appears internally inconsistent." (Emphasis in original.) Id. For a variety of reasons that have nothing to do with the record of this case, the majority "decline[s] to construe this ambiguity against the plaintiff," concluding that the trial court should have "understood the essence of [Farver's] claim" as one challenging the propriety of a second contempt finding rather than one requesting a sanction other than consecutive prison time. Id.

Contrary to the majority's conclusion, Farver's argument was not even slightly ambiguous. After holding the plaintiff in contempt of court for a second time, the trial court could have imposed a concurrent sentence,

a fine, or no sanction at all beyond the contempt finding itself. See General Statutes § 51-33.[6] The majority simply is wrong, therefore, that the court "necessarily" would have imposed a second sentence, let alone a consecutive one, following the second contempt finding. As I have explained, moreover, the record is crystal clear that Farver was seeking *any* sanction *other than a consecutive sentence.*

Indeed, under the majority's reading of the trial record, the plaintiff's claim on appeal would be deemed preserved *even if* the trial court had done exactly as Farver had requested and acceded to the argument that it would be unfair to impose any consecutive prison time in connection with the second contempt finding. In other words, if, in accordance with Farver's request, the trial court had agreed to impose a small fine, a concurrent sentence or no additional sanction at all, the majority nevertheless would conclude that the trial court should have known that Farver *really* was challenging the propriety of the second contempt finding itself rather than seeking to have the court impose something other than a consecutive sentence in connection with the second contempt finding. This fact highlights why the majority's analysis is so obviously in error. The record hardly could be clearer that Farver's *only* request was a sanction that did not include consecutive prison time.

It is readily apparent, moreover, that the trial court did not understand Farver's argument as embodying the claim that the plaintiff raises on appeal. On the contrary, after Farver had requested that the court spare the plaintiff any consecutive prison time because,

---

[6] General Statutes § 51-33 provides: "Any court, including a family support magistrate, may punish by fine and imprisonment any person who in its presence behaves contemptuously or in a disorderly manner; but no court or family support magistrate may impose a greater fine than one hundred dollars or a longer term of imprisonment than six months or both."

according to Farver, both contempt findings involved "one set of circumstances," the court acknowledged Farver's concern but explained that the two separate contempt findings were based on the plaintiff's refusal to answer two separate questions involving two separate incidents, each of which had independent significance.[7] At that point, Farver made no attempt to explain that the court had misunderstood his claim or to clarify that he *actually* was arguing that it would be improper for the court to make a second contempt finding because, even though the two questions were predicated on different facts involving different dates, the plaintiff's refusal to answer those questions constituted a single instance of contempt. Instead, Farver allowed the court to proceed on the understanding that he was questioning the fairness of a consecutive sentence, not that he was challenging the propriety of the second contempt finding. Indeed, if Farver had been challenging the propriety of that second finding of contempt, he easily could have, and undoubtedly would have, said so; he did not, however. Consequently, the only plausible explanation for Farver's failure to clarify his position is that Farver himself did not believe that the trial court had misunderstood his claim. In sum, there is nothing in the record of the trial court proceedings to support the majority's conclusion that Farver was disputing the lawfulness or propriety of the second finding of contempt.[8]

---

[7] As I previously indicated, in his interview with the police, the plaintiff had reported seeing the black Acura Integra sometime between 9 and 10 p.m. on April 16, 2005, and again on April 17, 2005, between 9:30 and 11 a.m.

[8] The majority asserts that I have focused improperly on the *"relief* being sought, without considering the court's understanding of the *basis* of that request for relief." (Emphasis in original.) Footnote 6 of the majority opinion. On the contrary, it is entirely proper to focus on the relief requested in the trial court because that request necessarily is central to the determination of how the trial court reasonably understood the claim raised in that court. In the present case, the trial court necessarily understood Farver to be claiming that a consecutive sentence was unwarranted because, simply stated, that is the claim that Farver articulated. The fact that Farver's argu-

"Appellate review of [trial court] rulings is ordinarily limited to the specific legal [ground] raised by the objection of trial counsel. . . . To permit a party to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party." (Citation omitted; internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 556, 821 A.2d 247 (2003). The majority's conclusion that Farver's objection was sufficiently clear to have alerted the trial court of the plaintiff's claim on appeal, namely, that the court lawfully could not hold the plaintiff in contempt of court for a second time, is belied by the unambiguous record. Consequently, the majority's conclusion is manifestly unfair to the trial judge, who could not possibly have divined such a claim from Farver's remarks. Unfortunately, the majority's conclusion also sends the wrong message to trial judges generally. It is one thing to hold our judges accountable for their decisions on claims that have been presented to them; it is another matter entirely to hold them responsible for failing to decide claims that never were raised. I submit that that is precisely what the majority has done in the present case.[9]

---

ment in support of that claim might also support *another, different* claim—in this case, the claim that the plaintiff raises on appeal—is no reason to conclude that the trial court should have understood Farver to be making a claim other than the one that he had articulated. The majority, however, employs the same flawed reasoning, which leads to an equally flawed conclusion.

[9] The majority asserts that this court should apply a less stringent preservation standard to claims involving nonparties. See footnote 6 of the majority opinion. Whether a more liberal test is appropriate in such cases is irrelevant to our resolution of the present appeal because no matter how generously one construes the colloquy between Farver and the trial court, a fair reading of the transcript of that colloquy leads to only one logical conclusion, namely, that Farver never raised the claim in the trial court that is the subject of this appeal.

## II

I therefore would review, under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[10] the plaintiff's claim that the trial court's second contempt finding violated his right to due process under the fourteenth amendment to the United States constitution[11] and his rights under the double jeopardy clause of the fifth amendment to the United States constitution.[12] I agree with the plaintiff that the trial court's second contempt finding was barred by those constitutional provisions.[13]

My conclusion is dictated by *Yates* v. *United States*, 355 U.S. 66, 73, 78 S. Ct. 128, 2 L. Ed. 2d 95 (1957), in which the court held that multiple refusals to testify are to be treated as a single act of contempt when the witness asserts a blanket refusal to testify or when the witness refuses to answer questions relating to a particular area or subject of inquiry. Although the majority is not required to address the constitutional implications of *Yates*, I agree with those courts that have concluded that the decision in *Yates* rested on principles of constitutional due process. See, e.g., *United States* v. *Coachman*, 752 F.2d 685, 688 n.20 (D.C. Cir. 1985) ("[s]ince [the petitioner in *Yates*] had argued

[10] See footnote 1 of this concurring opinion. The state concedes that the plaintiff's constitutional claims are reviewable under the first two prongs of *Golding*.

[11] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[12] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ."

The fifth amendment guarantee against double jeopardy is made applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

[13] The plaintiff also contends that the second contempt finding violated his state constitutional right to due process. In view of my conclusion that he has established a due process violation under the federal constitution, I do not address his state constitutional claim.

that the multiple contempt convictions violated the [f]ifth [a]mendment's [d]ue [p]rocess [c]lause, the [c]ourt rested its decision [on] that provision"); *People v. Fields*, 177 Ill. App. 3d 129, 135, 533 N.E.2d 48 (1988) ("[the] [c]ourt [in *Yates*] held [that] the imposition of [eleven] consecutive findings of contempt of a party for refusing to answer questions as to whether [eleven] different people were members of the Communist [p]arty deprived [her] of due process"), review denied, 125 Ill. 2d 569, 537 N.E.2d 814 (1989); see also *Ex parte Thompson*, Court of Appeals, Docket No. AP-75,720, 2008 WL 696476, *3 (Tex. Crim. App. March 5, 2008) ("*Yates* establishes, as a matter of due process, that only one contempt occurs" when witness refuses to answer question and consistently maintains that position). Although the court in *Yates* did not state expressly that its decision was based on due process grounds, all of the claims that the petitioner raised in that case were predicated on alleged violations of her constitutionally protected right to due process or her right to be free from cruel and unusual punishment;[14] *Yates* v. *United States*, supra, 71; and the court never suggested that it was resolving the issues presented by those claims on any alternative, nonconstitutional grounds. It appears, therefore, that the rule enunciated in *Yates* is a constitutional one.

The state contends that the plaintiff's due process claim is "factually baseless" because it "depends [on]

---

[14] The court in *Yates* characterized the claims of the petitioner in that case as follows: "This case presents three issues. [The] [p]etitioner claims that the sentences were imposed to coerce her into answering the questions instead of to punish her, making the contempts civil rather than criminal and the sentences to a prison term after the close of the trial a violation of [f]ifth [a]mendment due process. Second, [the] petitioner argues that her several refusals to answer on both June 26 and June 30 [1952] constituted but a single contempt which was total and complete on June 26, so that imposition of contempt sentences for the June 30 refusals was in violation of due process. Finally, [the] petitioner contends that her one-year sentences were so severe as to violate due process and constitute cruel and unusual punishment under the [e]ighth [a]mendment." *Yates* v. *United States*, supra, 355 U.S. 71.

the erroneous factual predicate that, prior to being held in contempt for a second time, the plaintiff clearly had refused to be examined or clearly had refused to be examined regarding a specific area of inquiry, and the state had artificially multiplied contempts by rephrasing the same or similar question twice." I reject this contention because I agree with the majority that, fairly viewed, the plaintiff's refusals to testify constituted either a blanket refusal to testify or a refusal to testify about anything relating to the case against Roberts.

The state also asserts that the plaintiff's due process claim is legally unfounded because, notwithstanding *Yates*, "two adjudications of contempt for successive refusals to answer two questions [are] not so numerous or oppressive as to constitute a denial of due process." I also disagree with this contention because it is contrary to *Yates*. As a general matter, a witness who either refuses to answer any questions or refuses to answer any questions about a particular subject or area of inquiry is subject to only one contempt finding.[15] See *Yates* v. *United States*, supra, 355 U.S. 73.

Even if *Yates* does not control, I also agree with the plaintiff's claim that the second contempt finding violated his rights under the double jeopardy clause of the fifth amendment to the United States constitution. For the reasons set forth by the majority, the plaintiff's refusal to testify on the second occasion was not subject to a second contempt finding because, under the common law, that refusal did not represent conduct that was separate and distinct from his first refusal to testify. In other words, the second refusal to testify was part

---

[15] To support its claim, the state relies on *State* v. *Vickers*, 309 A.2d 324 (Me. 1973), and *United States ex rel. Ushkowitz* v. *McCloskey*, 359 F.2d 788 (2d Cir. 1966). In each case, however, the court expressly distinguished the facts involved from those of *Yates*. See *United States ex rel. Ushkowitz* v. *McCloskey*, supra, 789; *State* v. *Vickers*, supra, 329. The facts of the present case, by contrast, cannot be distinguished from the facts of *Yates*.

of a single, continuing act of contempt. It seems clear that the imposition of multiple sentences for one act of contempt cannot be squared with the constitutional protection against double jeopardy. "The federal and state constitutions prohibit multiple punishments if: (1) the charges arise out of the same act or transaction; and (2) the charged crimes are the same offense." *State* v. *Mullins*, 288 Conn. 345, 378, 952 A.2d 784 (2008). The trial court's action in the present case satisfies the foregoing test because the plaintiff was subjected to multiple counts of criminal contempt for what properly should have been adjudged to be the same conduct.

Accordingly, I concur in the majority opinion insofar as the majority grants the writ of error and reverses the second finding of contempt. I also agree with the majority that the plaintiff is entitled to have that second finding of contempt vacated.